PER CURIAM.
In February 2008, a Mobile County grand jury returned an indictment against the appellant, Lam Luong, charging him with five counts of capital murder in connection with the deaths of his children, four-month-old Danny Luong, one-year-old Lindsey Luong, two-year-old Hannah Luong, and three-year-old Ryan Phan. The *102 murders were made capital because: (1) two or more persons were killed “by one act or pursuant to one scheme or course of conduct,” see § 13A-5-40(a)(10), Ala.Code 1975 (count I of the indictment); (2) Danny Luong was less than 14 years of age when he was murdered, see § 13A-5-40(a)(15), Ala.Code 1975 (count II of the indictment); (3) Ryan Phan was less than 14 years of age when he was murdered, see § 13A-5-40(a)(15), Ala.Code 1975 (count III of the indictment); (4) Lindsey Luong was less than 14 years of age when she was murdered, see § 13A-5-40(a)(15), Ala. Code 1975 (count IV of the indictment); and (5) Hannah Luong was less than 14 years of age when she was murdered, see § 13A-5-40(a)(15), Ala.Code 1975 (count V of the indictment).
Following a jury trial, Luong was convicted of all five counts of capital murder, as charged in the indictment. The jury recommended, by a vote of 12-0, that Luong be sentenced to death. The circuit court accepted the jury’s recommendation and sentenced Luong to death for the five capital-murder convictions. This appeal followed.
The State’s evidence tended to show that on January 7, 2008, Luong drove his four children to the top of the Dauphin Island bridge and threw each child off the bridge to the water 100 feet below. Danny’s body was discovered on January 12 in a marshy area approximately 12 miles from the bridge; Lindsey’s body was discovered on January 15 approximately 18 miles from the bridge, in Mississippi; Hannah’s body was discovered on January 20 approximately 144 miles from the bridge, in Louisiana; and Ryan’s body was discovered on January 13 approximately 16 miles from the bridge. The medical examiner testified that all four children were alive when they were thrown off the bridge; that Danny, Ryan, and Lindsey died as a result of blunt-force trauma and asphyxia due to drowning; and that the cause of Hannah’s death was drowning.
Kieu Luong, Ling’s common-law wife,[1] testified that around 10:00 a.m. on January 7, 2008, Luong came to the nail salon where she worked and asked her for money. She gave him $31, she said, so that he could get gasoline for their van. Kieu stated that after Luong left the salon she tried repeatedly to reach Luong by telephone but was unsuccessful. At around 7:00 p.m. that evening she finally spoke to Luong and he told her that he had left the children with “somebody else,” a woman named “Kim.” (R. 1036.) Later that night Kieu and Luong reported to police that the children were missing. The next morning, Kieu said, she and Luong went to the police station and were questioned separately by police. Kieu asked police if she could speak with Luong. Luong then told Kieu that the children were all dead, that he had thrown them off a bridge, and that he would take police to the bridge.
The jury convicted Luong of five counts of capital murder. Following a separate sentencing hearing, the jury unanimously recommended that Luong be sentenced to death. This appeal, which is automatic in a case involving the death penalty, followed. See § 13A-5-53, Ala.Code 1975.

Standard of Review

Because Luong has been sentenced to death, this Court must review the circuit court proceedings for plain error. Rule 45A, Ala. R.App. P., provides:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under re *103 view, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the.appellant.”
In discussing the plain-error standard' of review, the Alabama Supreme Court has stated:
“ ‘ “ ‘Plain error’ arises only if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.”’ Ex parte Womack, 435 So.2d 766, 769 (Ala.1983) (quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981)). See also Ex parte Woodall, 730 So.2d 652 (Ala.1998). ‘ “In other words, the plain-error exception to the contemporaneous objection rule is to be ‘used sparingly,' solely in those circumstances in which a miscarriage of justice would otherwise result.”” Ex parte Land, 678 So.2d 224, 232 (Ala.1996) (quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982))). ‘To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s “substantial rights,” but it must also have an unfair prejudicial impact on the jury’s deliberations.’ Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001). This Court may take appropriate action when the error ‘has or probably has adversely affected the substantial rights of the appellant.’ Rule 45A, Ala. R.App. P. ‘[A] failure to object at trial, while not precluding our review, will weigh against any claim of prejudice.’ Ex parte Woodall, 730 So.2d at 657 (citing Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991)).”
Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002).
With these principles in mind, we review the claims raised by Luong in his brief to this Court.
I.
Luong first argues that the circuit court erred in denying his motion for a change of venue because, he says, there was excessive prejudicial pretrial publicity surrounding the case, which made it impossible for him to receive a fair trial in Mobile County. In a related issue,- Luong argues that the circuit court erred by not allowing him to conduct individual voir dire of the prospective jurors on the issue of prejudicial pretrial publicity.
Article I, § 6, Alabama Constitution of 1901, states, in part: “That in all criminal prosecutions, the accused has a right to ... a speedy public trial, by an impartial jury....”
Section 15-2-20, Ala.Code 1975, provides:
“(a) Any person charged with an indictable offense may have his trial removed to another county, on making application to the court, setting forth specifically the reasons why he cannot have a fair and impartial trial in - the county in which the indictment is found.”
“The burden is upon the defendant to show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried.” See Rule 10.1(b), Ala. R.Crim. P. “Whether to change venue is discretionary with the trial judge.... In determining whether there has been an abuse of that discretion, an appellate court *104 reviews the trial judge’s order de novo, without any presumption in favor of that order.” Ex parte Fowler, 574 So.2d 745, 748 (Ala.1990).
The record indicates that in April 2008, Luong moved for a change of venue. In that motion, counsel argued, in part, as follows:
“Heightened publicity has surrounded [Luong] and the crime for which he is •charged from the very first moment. Articles in the Mobile Register with a circulation in excess of 350,000 publications weekly in Mobile County, publicized the- acts with which [Luong] is charged, and has given extensive news coverage to allegations that [Luong] has confessed to the above referenced crime.... ”
(C.R.182.) Luong also moved for approval of expenses so that he could obtain the services, of a polling expert. (C.R.188.) The circuit court granted that motion. .
At. a pretrial hearing, the circuit court indicated that “the case might have to be moved.” (R. 57.)[2] At another hearing, the circuit court said that it believed that individual voir dire was going to be necessary and that the voir dire examination would probably take at least a week to complete. (R. 46.) However, the circuit court deferred ruling on the motion for a change of venue until after the prospective jurors had completed voir dire examination. (R. 48.) Also, Luong’s motion to sequester the jury was granted. (R. 291.)
On March 5, 2009, four days before Luong’s trial was scheduled- to begin, Luong indicated that he wished to plead guilty. (R. 309.) The circuit court said that because Luong was’ pleading guilty it was not necessary to consider the motion for a change of venue. (R. 335.) A colloquy with Luong was conducted concerning the ramifications of his guilty plea. (R. 350.)[3] On March 9, 2009, the date Luong’s trial was scheduled to begin, the circuit court- again went over with Luong the ramifications of pleading guilty. At this time, Luong asked the circuit court why the process was so complicated if he was pleading guilty and told the court that he had been told by a fellow prisoner at the jail that the proceedings would be over if he pleaded guilty. (R. 361.) Luong then indicated that he wished to withdraw his guilty plea. (R. 379.) The circuit court allowed Luong to withdraw his plea.
After Luong withdrew his plea, defense counsel renewed the motion for a change of venue. Counsel also moved that the trial be continued because of the prejudicial publicity surrounding Luong’s guilty plea -and his decision to withdraw that plea. (R. 380.) The following occurred:
“[Defense counsel]: Your Honor, because of the publicity that has come out subsequent, through the whole course of the proceedings, and since the last time we were in court, we would renew our motion for change of venue and move to *105 continue the case because the publicity is going to be so extensive. The jury questionnaires that we got back, almost to a person, knew about the case; and the bulk of them know about the guilty plea. And I don’t know that that can be put out of their minds. And we’re now going to be faced with a jury panel that has heard on more than one occasion through' the media about wishing to plead guilty, and being guilty, and all of that. And we feel at this point that it would be impossible to get a fair jury to try this case, given this publicity.
“And we would ask the Court to, first off, I guess to continue the case, and then — We’re making an oral motion for change of venue now, then we would file a written motion. Because even before this untoward turn of events, we would proffer that Dr. Kennedy would, have testified that 71 percent of the people in Mobile County already believed [Luong] to be guilty. And that percentage can only have increased-as a result of what has transpired.
“The Court: The Court is well aware of that concept in our law called the invited error rule where a defendant would cause matters to be injected in the trial of a case which might otherwise work to his — had he not, worked to his benefit. But in this case, [Luong] chose to plead guilty and to do' so in open court, and to invite or urge the reading of a letter that he wished to present to the Court. The letter was read. It was never objected to; as a matter of fact, it was encouraged.
“And whatever news coverage there was with regards to that was factual and accurate, and was hot intended to be sensational; it just simply covered what [Luong] had, in fact, done and made the decision to do on his own.”
(R. 380-81.) The circuit court set aside its ruling granting Luong’s motion to sequester the jury and denied that motion. (R. 386.)
On March 9, 2009, the voir dire examination began, and 156 prospective jurors completed juror questionnaires related to Luong’s case. The questionnaire consisted of 11 pages. Question number 51 specifically asked the jurors if they had read or heard about the case and the content of what they had read or heard.[4] (Suppl.R.191.) Most of the jurors who indicated that they had heard or read about the case did not complete the question concerning the content of what they had heard or read.
A review of the questionnaires indicates that of the 156 jurors who completed questionnaires, 139 of those jurors had heard about the case and only 15 had not heard about the case;[5] 38 of the jurors who had heard about the case responded that they had heard or read that Luong either had confessed to the murders or had pleaded guilty to the murders.
After the circuit court held that it was allowing individual voir dire, the following occurred:
*106 “The Court: What I am going to do is I’m going to say: I want everybody to raise their hand if they have heard, read, or seen, or by word of mouth know anything about this case. Raise your hand. Don’t tell me what it is.
“We’re going to take their names. I’m going to have them identify who they are and then we will take them individually.”
(R. 391.)
However, during voir dire examination the circuit court merely asked the following questions concerning pretrial publicity:
“The Court: Okay. I have told you that there has been media coverage from various media outlets about this case. And I want to see a show of hands as to who may remember seeing, reading or hearing anything about this case.
“(Response.)
“The Court: Okay. I think a better question would be — please put your hands down.
“(Laughter.)
“The Court: Who among you have not heard, read or seen anything about this case?
“(Response.)
“The Court: Okay. Could you — Ma’am, could you stand and give us your name and your number?
“[S.E.]: [S.E.], number 62.
“The Court: Thank you, ma’am. You may be seated.
‘Tes, sir?
“[L.M.]: [L.M.], number 63.
“The Court: Thank you very much. Okay.
“Now, listen to this question very carefully. Would any of you, based on what you have read, seen, or heard, or remember, could you set those things aside and serve as a fair and impartial juror?
“In other words, is there any member of the jury who thinks because they have a recollection of this case, whether it be from radio, television, or newspaper, Internet, or any other source, that it would be impossible for you to put that aside, lay that aside and sit as a fair and impartial juror in this case and base your decision only on the evidence as you hear it is in this courtroom?
“Can any of you — or would any of you tell me it would be impossible for you to sit as a fair and impartial juror in this case?
“(Response.)
“The Court: I see a hand in the back. Could you please stand, sir, and just give us your name and number?
“[S.T.]: Mr. [S.T.], 141.
“The Court: [S.T.], you are telling me that regardless of what you have heard, read or seen, you are telling me that you in no way could set that aside and sit as a juror?
“[S.T.]: No, sir.
“The Court: Thank you. Is it 144?
“[S.T.]: 141.
“The Court: All right. The rest of you are telling me that even though you may have heard, read or seen matters about this case, and you may have had some preconceived impression or opinion, based on what you have heard, read or seen, that you could sit as a juror in this case, base your verdict only on the evidence as it comes from the witness stand and any evidence that may be introduced into evidence in the form of photographs or documents or something, and you could render a fair and impartial verdict by setting aside any of that and base your verdict on the evidence *107 that you hear in this courtroom? You can do that.
“(Response.)
“The Court: If you can’t, other than [S.T.], please raise your hand.
“(No response.)”
(R. 453-56.)
Luong objected to the circuit court’s method of handling the issue of pretrial publicity and the court’s failure to allow individual voir dire:
“[Defense counsel]: Your Honor, if it please the Court, if — at one point in the proceedings it was our understanding that Your Honor was going to allow individual voir dire of the jurors about what they had heard. And initially we just asked if anybody heard anything. And then whoever it was, we would bring them in and not ask them any more in the whole group. Bring them in and ask them about the publicity and going into that.
‘Your Honor did pose questions to them about putting it aside and going on to trial. But we submit that handling it in this fashion without us being able to question the jurors individually about their exposure to publicity prevents us from having them disclose the existence of actual prejudice, the degree to which they had been exposed to prejudicial publicity, and how that exposure had affected them and their attitudes toward the trial. It prevents us showing the degree and effect of pretrial publicity, and to ensure a fair trial.
“And in the poll Dr. [Verne] Kennedy made, it said — and that was before we had the business about pleading guilty come up — 71 percent of the people in Mobile County felt that Lam Luong was guilty.
“After we had done the voir dire, I think it was 16 people or approximately 10 percent of the jurors stated they had previously voiced the opinion that Lam Luong should be put to death. We submit that shows a great deal of, I would say, prejudicial publicity and a high degree of saturation, when you have 10 percent of the people already making a statement that he should be put to death.
“It prevents — by not being able to question these assorted jurors, it prevents us from supporting our motion for change of venue based upon the degree and saturation of prejudicial publicity; by not being able to explore this, [Luong] is denied the effective assistance of counsel. [Luong] is denied the opportunity to ensure a fair and impartial jury as' protected by the Constitution of Alabama and the United States.
“Our second.
“It prevents us from questioning these jurors individually to ascertain their attitudes. It may or may not rise to the level of a fixed opinion but it would certainly interfere with our ability to intelligently exercise our peremptory strikes because we don’t know what kind of thoughts are- in their head, what they’ve seen or heard or been exposed to.”
(R. 586-87.) The circuit court ruled that there was no law requiring individual voir dire in a capital case, that a lengthy questionnaire had been completed by all the prospective jurors, that the circuit court had asked the venire as a whole if the members could put aside what they had read or heard about the case, and that only one person responded in the negative to that-question. (R. 589.)
The record also indicates that during voir dire 11 jurors were questioned individually because they said during voir dire that they had made the' comment that Luong should be sentenced to death. Of *108 these 11 jurors, 7 said that, based on the pretrial publicity surrounding the case, they believed that Luong should be sentenced to death. They were removed. One of these jurors, T.F., made the following observation about the pretrial publicity:
“Well, just pretty much information overload from the media. Anytime you turn on the TV set or read a paper, it was always in the paper. And really played up to the hilt, you know, and been saturated with the facts as we know them,”
(R. 896.)
The record further indicates that all 12 of the jurors who served on Luong’s jury answered on their juror questionnaires that they had heard or read about ,the case; 7 of the jurors indicated that they had heard Luong had confessed or that he had pleaded guilty. (Suppl. R. 202, 267, 520, 751, 850, 927, 960, 1136, 1147, 1718, 1773, and 1828.) However, none of the jurors who served on Luong’s jury were questioned individually concerning their exposure to pretrial publicity.
In support of the motion for a change of venue, Luong also presented the results of a telephone poll that had been conducted by Dr. Verne Kennedy, the president of Market Research Insight. The poll conducted in January 2009 of 350 people in the Mobile area revealed that 84% of those polled had heard about the case, 44% had heard a great deal about the case, 71% had a personal opinion that Luong was guilty, and 75% thought that other people viewed Luong as guilty. (C.R.387-90.)
At the conclusion of voir dire, the circuit court denied the motion for a change of venue after finding that the publicity surrounding the case, although extensive, was factual and that the voir dire examination revealed no actual prejudice. (R. 915.)
“In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated ‘actual prejudice’ against him on the part of the jurors; 2) when there is ‘presumed prejudice’ resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S, 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) ]; Estes v, Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed,2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th Cir.1983).”
Hunt v. State, 642 So.2d 999, 1042-43 (Ala.Crim.App.1993).
A. Presumptive Prejudice
Luong first argues that the pretrial publicity in this case was so inflammatory and prejudicial that the presumed-prejudice standard warranted that his case be moved to another county free from negative publicity.
Many state and federal courts have noted the rarity of situations involving the presumed-prejudice standard and' those fact situations that warrant such a finding. “In rare cases, the community is so predisposed that prejudice can be presumed and venue must be transferred as a matter of law. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed,2d 663 (1963).” Sanchez v. State, 142 P.3d 1134, 1139 (Wyo.2006).
“Cases in which prejudice is presumed are ‘relatively rare and arise out of the most extreme circumstances.’ [State v.] Koedatich, 112 N.J. [225] at 269, 548 A.2d 939 [ (1988) ]. ‘Presumptively prejudicial *109 publicity' means a ‘torrent of publicity that creates a carnival-like setting' or ‘a barrage of inflammatory reporting that may but need not include all of the following: evidence that would be inadmissible at the trial, editorial opinions on guilt or innocence, and media pronouncements on the death-worthiness of a defendant.' [State v.] Harris, 156 N,J. [122] at 143, 147-48, 716 A.2d 458 [ (1998) ]. , The existence of such presumed prejudice obviates the need for conducting voir dire.”
State v. Nelson, 173 N.J. 417, 475-76, 803 A.2d 1, 35-36 (2002).
“Pre-trial publicity will be presumed to have been prejudicial if the defendant is able to prove that the publicity was sensational, inflammatory, and slanted toward conviction, rather than factual or objective; that such publicity revealed the defendant’s prior criminal record, if any, or referred to confessions, admissions, or reenactments of the crime by the defendant; or it was derived from official police and prosecutorial reports.”
Commonwealth v. Karenbauer, 552 Pa. 420, 434, 715 A.2d 1086, 1092 (1998).
“ “Where media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process, a court reviewing for constitutional error will presume prejudice to the defendant without reference to an examination of the attitudes of those who served as the defendant’s jurors.' Rock v. Zimmerman, 959 F.2d 1237, 1252 (3d Cir.1992). The community and .media reaction must have been so hostile and so pervasive that it is apparent even the most careful voir dire process would be unable to assure an impartial jury. Id.”
Hetzel v. Lamas, 630 F.Supp.2d 563, 570 (E.D.Pa.2009). See also State v. Navarrete, 221 Neb. 171, 173-74, 376 N.W.2d 8, 10 (1985).
Alabama courts have stated the following concerning' the presumed-prejudice standard:
“ ‘Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory arid the prejudicial pretrial publicity saturated the community where the trials were held.' [Coleman v. Kemp,] 778 F.2d [1487] at 1490 [ (11th Cir.1985) ] (emphasis added). See also Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
“In determining whether the ‘presumed prejudice' standard exists the trial court should look at ‘the totality of the surrounding facts.' Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is ‘rarely' applicable, and is reserved'for only ‘extreme situations.' Coleman v. Kemp, 778 F.2d at 1537. ‘In fact, our research has uncovered only a very few ... cases in which relief was granted on the basis of presumed prejudice.' Coleman v. Kemp, 778 F.2d at 1490.
“Hunt had the burden of showing that ‘prejudicial pretrial publicity' saturated the community. Sheppard [v. Maxwell, 384 U.S. 333 (1966)]. ‘[T]he burden placed- upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one.5 Coleman v. Kemp, 778 F.2d at 1537. ‘Prejudicial' publicity usually must consist of much more than stating the charge, and *110 of reportage of the pretrial and trial processes. ‘Publicity’ and ‘prejudice’ are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial.”
Hunt v. State, 642 So.2d 999, 1043 (Ala.Crim.App.1993).
Recently, the United States Supreme Court in Skilling v. United States, 561 U.S. 358, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010), revisited the proof necessary to satisfy the presumed-prejudice standard in regard to a motion for a change of venue and stated:
“ ‘The theory of our [trial] system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.’ Patterson v. Colorado ex rel. Attorney General of Colo., 205 U.S. 454, 462 (1907) (opinion for the Court by Holmes, J.). When does the publicity attending conduct charged as criminal dim prospects that the trier can judge a case, as due process requires, impartially, unswayed by outside influence? Because most cases of consequence garner at least some pretrial publicity, courts have considered this question in diverse settings. We begin our discussion by addressing the presumption of prejudice from which the Fifth Circuit’s analysis in Skilling’s case proceeded. The foundation precedent is Rideau v. Louisiana, 373 U.S. 723 (1963).
“Wilbert Rideau robbed a bank in a small Louisiana town, kidnaped three bank employees, and killed one of them. Police interrogated Rideau in jail without counsel present and obtained his confession. Without informing Rideau, no less seeking his consent, the police filmed the interrogation. On three separate occasions shortly before the trial, a local television station broadcast the film to audiences ranging from 24,000 to 53,-000 individuals. Rideau moved for a change of venue, arguing that he could not receive a fair trial in the parish where the crime occurred, which had a population of approximately 150,000 people. The trial court denied the motion, and a jury eventually convicted Rideau. The Supreme Court of Louisiana upheld the conviction.
“We reversed. ‘What the people [in the community] saw on their television sets,’ we observed, ‘was Rideau, in jail, flanked by the shex-iff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder.’ Id., at 725. ‘[T]o the tens of thousands of people who saw and heard it,’ we explained, the inteiTogation ‘in a very real sense was Rideau’s trial — at which he pleaded guilty.’ Id., at 726. We therefore ‘d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire,’ that ‘[t]he kangaroo court proceedings’ trailing the televised confession violated due process. Id., at 726-727.
“We followed Rideau’s, lead in two later cases in which media coverage manifestly tainted a criminal prosecution. In Estes v. Texas, 381 U.S. 532, 538 (1965), extensive publicity before trial swelled into excessive exposure during preliminary court proceedings as reporters and television crews overran the courtroom and ‘bombard[ed] ... the community with the sights and sounds of the pretrial hearing. The media’s overzealous reporting efforts, we observed, ‘led to considerable disruption’ and denied the ‘judicial serenity and calm to which [Billie Sol Estes] was entitled.’ Id., at 536.
*111 “Similarly, in Sheppard v. Maxwell, 384 U.S. 333 (1966), news reporters extensively covered the story of Sam Sheppard, who was accused of bludgeoning his pregnant wife to death. ‘[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom,' thrusting jurors ‘into the role of celebrities.’ Id., at 353, 355. Pretrial media coverage, which we characterized as ‘months [of] virulent publicity about Sheppard and the murder,’ did not alone deny due process, we noted. Id., at 354. But Sheppard’s case involved more than heated reporting pretrial: We upset the murder conviction because a ‘carnival atmosphere’ pervaded the trial, id., at 358.
“In each of these cases, we overturned a ‘conviction obtained in a trial atmosphere that [was] utterly corrupted by press coverage’; our decisions, however, ‘cannot be made to stand for the proposition that juror exposure to ... news accounts of the crime ... alone presumptively deprives the defendant of due process.’ Murphy v. Florida, 421 U.S. 794, 798-799 (1975). See also, e.g., Patton v. Yount, 467 U.S. 1025 (1984). Prominence does not necessarily produce prejudice, and juror impartiality, we have reiterated, does not require ignorance. Irvin v. Dowd, 366 U.S. 717, 722 (1961) (Jurors are not required to be ‘totally ignorant of the facts and issues involved’; ‘scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.’); Reynolds v. United States, 98 U.S. 145, 155-156 (1879) (‘[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some- impression or some opinion in respect to its merits.’). A presumption of prejudice, our decisions indicate, attends only the extreme case.
“Relying on Rideau, Estes, and Sheppard, Skilling asserts that we need not pause to examine the screening questionnaires or the voir dire before declaring his jury’s verdict void. We are not persuaded. Important differences separate Skilling’s prosecution from those in which we have presumed juror prejudice.
“First, we have emphasized in prior decisions the size and characteristics of the community in which the crime occurred. In Rideau, for example, we noted that the murder was committed in a parish of only 150,000 residents. Houston, in contrast, is the fourth most populous city in the Nation: At the time of Skilling’s trial, more than 4.5 million individuals eligible for jury duty resided in the Houston area. App. 627a. Given this large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empaneled is hard to sustain. See Mu’Min v. Virginia, 500 U.S. 415, 429 (1991) (potential for prejudice mitigated by the size of the ‘metropolitan Washington [D.C.] statistical area, which has a population' of over 3 million, and in which, unfortunately, hundreds of murders are- committed each year’); Gentile v. State Bar of Nev., 501 U.S. 1030, 1044 (1991) (plurality opinion) (reduced likelihood of prejudice where venire was drawn from a pool of over 600,000 individuals).
“Second, although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight. Rideau’s dramatically *112 staged admission of guilt, for instance, was likely imprinted indelibly in the mind of anyone who watched it. Cf. Parker v. Randolph, 442 U.S. 62, 72 (1979) (plurality opinion) (‘[T]he defendant’s own confession [is] probably the most probative and damaging evidence that can be admitted against him.’ (internal quotation marks omitted)). Pretrial publicity about Skilling was less memorable and prejudicial. No evidence of the smoking-gun variety invited prejudgment of his culpability. See United States v. Chagra, 669 F.2d 241, 251-252, n. 11 (C.A.5 1982) (‘A jury may have difficulty in disbelieving or forgetting a defendant’s opinion of his own guilt but have no difficulty in rejecting the opinions of others because they may not be well-founded.’).
“Third, unlike cases in which trial swiftly followed a widely reported crime, e.g., Rideau, 373 U.S., at 724, over four years elapsed between Enron’s bankruptcy and Skilling’s trial. Although reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron’s collapse. See App. 700a; id., at 785a; Yount, 467 U.S., at 1032, 1034.
‘‘Finally, and of prime significance, Skilling’s jury acquitted him of nine insider-trading counts. Similarly, earlier instituted Enron-related prosecutions yielded no overwhelming victory for the Government. In Rideau, Estes, and Sheppard, in marked contrast, the jury’s verdict did not undermine in, any way the supposition of juror bias. It would be odd for an appellate court to presume prejudice in a case in which jurors’ actions run counter to that presumption. See, e.g., United States v. Arzola-Amaya, 867 F.2d 1504, 1514 (C.A.5 1989) (‘The jury’s ability to discern a failure of proof of guilt of some of the alleged - crimes indicates a fair minded consideration of the issues and reinforces our belief and conclusion that the media coverage did not lead to the deprivation of [the] right to an impartial trial.’).”
561 U.S. at 378-84, 130 S.Ct. at 2913-16.
Accordingly, this Court will examine: (1) the size and characteristics of the community where the crimes occurred; (2) the general content of the media coverage; (3) the timing of the media coverage in relation to the trial; and (4) the media interference with the trial or the verdict. See also United States v. Diehl-Armstrong, 739 F.Supp.2d 786 (W.D.Pa.2010).
(1) Size and Characteristics of the Community
Luong was tried in Mobile County in 2009. The United States Census Bureau reported that the population of Mobile County as reported in the 2010 census was approximately 412,000.[6]
“[T]he smaller the community, the more likely there will be a need for a change of venue ... when a heinous crime is committed.” Nebraska Press Ass’n v. Stuart, 427 U.S. 539, 599-600 n. 22, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), “Given the size of the community [600,000] from which any potential jury venire would be drawn ... only the most damaging information could give rise to any likelihood of prejudice.” Gentile v. State Bar of Nevada, 501 U.S. 1030, 1044, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991). The size of the community is one factor when assessing the merits of a mo *113 tion for a change of venue, though the fact that a case is being tried in a larger county-does not automatically mean that an impartial jury can be selected in that county. See Copeland v. State, 457 So.2d 1012 (Fla.1984)
The Mobile Press-Register is the local newspaper in Mobile County. Dewey English, the managing editor of the Press-Register, stated that the circulation of the Press-Register is over 219,000 or 58% of the adults in the Mobile area, that on Sunday the circulation increases to 271,000 and that during an average week the Press-Register is read by approximately 385,000 or 81% of all adults in the Mobile area.
“A serious case will tend to draw most of the public’s attention in any size community ...” State v. Galindo, 278 Neb. 599, 641, 774 N.W.2d 190, 227 (2009).
(2) General Content of Media Coverage
It is uncontested that the media coverage concerning this case was extensive. Luong introduced numerous articles that had been published in the Press-Register. Articles appeared every day from January 9, 2008, through January 24, 2008. On many days three or more articles appeared in the same paper. Articles were also published on: January 27, 2008; February 3, 2008; February 11, 2008; February 26, 2008; March 1, 2008; April 2, 2008; May 28, 2008; August 9, 2008; October 15, 2008; November 14, 2008; December 31, 2008, and during voir dire examination in March 2009.
Below are the dates, titles, and brief synopses of articles related to the case that appeared in the Press-Register:
January 9, 2008: “Dad Says He Threw 4 Tots Off Dauphin Island Bridge.” > Reported that Luong confessed to throwing his four children off the Dauphin Island Bridge, that Luong had told police that he had given his children to a woman, a story that had proven false, that Luong threw his children off the bridge in an act of revenge against his wife, and that local law-enforcement agencies were conducting an extensive search for the bodies.
January 10, 2008: “Relatives Noticed a Violent Change.” Reported that Luong was described as a “desperate crack addict given to bouts of violent anger” and that Luong hit the children “all the time.” It was also reported that in response to the tragedy counseling would be available to those in need and that the Mobile community needed to integrate the Asian community into faith-based and social services.
January 10, 2008: “Desperate Search.” Reported that Luong had confessed, that the murders were committed in an act of revenge against his wife, that Luong had been arrested in Mississippi, that Luong had a 1997 conviction for possession of cocaine, that Luong had been charged in 2000 with possession of cocaine but the charges had been dropped, and that Luong pleaded guilty to a drug charge in 1997 and was sentenced to 3 years.
January 10, 2008: “Search Comes Up Empty Wednesday.” Gave a detailed account of the multiple search efforts that were then under way to locate the four children.
January 10, 2008: “ 7 Hope the Babies Are Still Alive.’ ” • Reported a conversation with a local Asian .business owner who said that Luong would come into his business and buy cigarettes and that he “was crazy.” The owner was also quoted as saying that “Luong ha[d] trouble with wine, with cocaine” and that Luong hung out with “crackheads.”
*114 January 10, 2008: . “Similar Cases.” Summarized other murder cases from 1989 through 2007.
January 11, 2008: “Community Says Prayers for Children.” Reported what the Asian community was saying about the murders.
January 11, 2008: “Could Family Tragedy Have Been Averted? ” This editorial stated, in part: “[TJhere is evidence that Mr. Luong’s troubles were well known in the Asian-American community around Bayou La Batre; and there is a report of a run-in with law enforcement in Georgia. In both the Bayou and in Georgia, signals that this family needed help seemingly were ignored.” Also discussed Luong’s problems with drugs, his criminal record, and a quote from a relative, “He hit the kids all the time. I could see him getting fed up and throwing the kids off a bridge.” January 11, 2008: “Search Goes On.” Reported that Luong recanted his confession, that he had a history of drug abuse, that residents who lived near the search area were asked to walk their property for any signs of the children, that various search efforts where still underway, and that the district attorney was quoted as saying, “This is as bad, as it gets.... I know we’ve never had anything like this.”
January 12, 2008: “Sonar May Help Find Lost Children.” Reported Luong’s confession, that Luong had recanted his confession, and that the authorities had been quoted as saying that all the evidence pointed to’ Luong’s guilt. Also reported the technology that was being used to locate the' bodies.
January 12, 2008: “Explaining Evil.” Reported that Luong had confessed, that Luong had recanted his confession, and said, “While Lam Luong recanted to his lawyer Thursday, Mobile’s lead prosecutor discounted the statement and said murder charges against Luong were warranted.” Also reported that the deaths had affected the community as a whole.
January 13, 2008: “Where Were the Big Media in South Alabama? ” This editorial speculated as to the reasons why the case had not gotten national media attention. The author said that the reasons could have been that the victims were born to parents of Asian descent, that Luong is a crack addict, or that the family members who had asked for help “spoke in heavily accented English.”
January 13, 2008: “Baby’s Body Found.” Reported that the body of the youngest child, Danny, had been discovered in the marshlands of south Mobile County and that Luong had confessed and gave possible motives for the murders.
January 13, 2008: “Human Eyes, High-Tech Tools.” Reported the frustration the search teams were having in trying to locate the victims and the use of a sophisticated sonar system in that attempt.
January 13, 2008: “Revelry Continues on Dauphin Island.” This article stated, in part: “Before the parade began, a police car cruised the route, asking parade goers to observe a moment of silence for the four children of Kieu Phan. Police have said her husband, Lam Luong, has confessed to throwing the four from the Dauphin Island Bridge. One of the bodies was recovered Saturday. Many people hung their heads for a moment before turning their attention back to the party.”
January 14, 2008: “Another Body Found; Two are Still Missing.” Reported that the body of three-year-old Ryan Phan was discovered in Mississippi, that Luong had confessed to the mur *115 ders, that Luong’s lawyer said that Luong had been pressured by police to confess, that Luong’s attorney intended to ask for an interpreter, that Luong had been calling Kieu Phan from.jail, and that an account “Love for the 4” had been set up at a local bank to pay for the funeral arrangements.
January 14, 2008: “Local Experts Weigh in on Why Parents Kill.” This article discussed the possible reasons why a parent would kill a child — revenge or desperation — and the statistics on the number of parents who kill their children. The article stated, in part, “How could a man throw four children from the top of an 80-foot bridge? It’s a question that has been haunting people in the area since Lam Luong, a 37-year-old Irvington man, told police he hurled his children, ranging in age from 4 months to 3 years, into the smft waters beneath the Dauphin Island Bridge last week. Luong confessed to killing the children in an attempt to get back at his wife, a story he later recanted.”
January 15, 2008: “Pray For This Mother.” Reported that everyone in community was praying for the mother, that a candlelight vigil was held to honor the children, and what possible motives Luong could have had to murder his children.
January 15, 2008: The “Sound Off” section of the paper contained a comment from a reader that it was no time to have a Mardi Gras parade when the community was still looking for the missing children.
January 15, 2008: “Their Call.” Reported the telephone calls that Luong had been making to his wife from the Mobile jail.
January 15, 2008: “Oddfellows Cemetery Donates Graves for Children.” Reported that a local cemetery had donated graves in which the children could be buried and also had set aside another plot for their mother.
January 16, 2008: “Third Child’s Body Found.” Reported that the third child’s body had been found, that Luong had been pressured to make a confession, that counsel had requested to hire an interpreter, that the district attorney had objected, arguing that Luong understood and spoke English, and that Luong wore a bulletproof vest at the hearing on the issue of the interpreter.
January 16, 2008: “Bayou Residents Mourn for Children. ” Detailed' the various temporary memorials that had been erected in memory of the four child victims.
January 17, 2008: “Rain Disrupts Search for Girl.” Reported the search efforts that had been made to find the fourth child and the difficulties the authorities had encountered.
January 18, 2008: “Bayou Tragedy Takes Backseat on National News.” Reported that “[l]ike many others in the Mobile area, Don Middleton has found himself consumed by the tragedy of the four young children .who police say were thrown to their deaths from the highest point of the Dauphin Island bridge. He said he had watched, listened to and read every report he found about the tragedy — and he is upset that the story seemingly has taken a backseat to other news events and criminal cases in national media coverage.” Also noted that every time a body had been discovered the local television stations would break into normal programming.
January 18, 2008: “Search to Continue for Last Missing Child.” Reported that over 150 volunteers had been helping with the search to locate the last child’s body, that Luong had confessed,, and *116 that Luong was addicted to crack cocaine.
January 18, 2008: In the “Letters to the Editor” section a resident disagreed with the observations made by a doctor in an earlier published story about why parents kill. She ended the letter by stating, “I would, however, strongly disagree that Mr. Lam Luong had no other way out but to kill his children. This is a very, very sad story.”
January 19, 2008: “Search to Continue Today for Last Child.” Reported the problems encountered in securing a body in the water in cold temperatures because the body often stays under water. Also reported that Luong had confessed that he threw the children off the bridge in an act of revenge against his wife.
January 19, 2008: “Stories of k Little Lives.” Gave a detailed biography of each of the four victims.
January 19, 2008: In the “Letters to the Editor” section a Mobile County resident wrote: “After reading a .,. January 13 column (‘Where are the big media in South Alabama?’) concerning the recent murders of four local children, allegedly by their father, I felt an overwhelming sense of dismay. Instead of asking why the national news media is not ‘all over the scene,’ as with Andrea Yates in Houston and the disappearance of Natalee Holloway, shouldn’t we ask why such coverage is desirable or acceptable in any tragedy? ... Lam Luong, the children’s father, has been quoted as wanting to become famous for this horrible deed. Isn’t his wish being fulfilled each time this story is repeated and sensationalized? Has 24-hour ‘news’ coverage caused such a demand for stories to fill that vast time that it has created a hungry monster whose appetite can never be satisfied? Are we becoming so insensitive by the constant bombardment with heinous acts committed by unstable human beings that another’s tragedy becomes our entertainment?”
January 20, 2008: “Heroic Search Effort.” Reported again the problems encountered in the search efforts.
January 20, 2008: “In our Anger, Let’s Remember the Bottom Line.” This editorial discussed the community’s outrage against Luong and stated, in part:
“Consider this call the other day. ‘That guy that threw them kids from the bridge,... Someone ought to break him out of jail and take him and stick him out on a fire ant hill and let the ants eat him just to enjoy [his] screams, I tell you, anybody who does that to a kid, especially their own kids, deserves to be dead immediately-’
“This is not an isolated sentiment in the Mobile community about Lam Luong, who is accused of murdering his four young children. In addition to calling the Press-Register’s ‘Sound Off,’ people have flooded local TV stations’ blogs to express the same sort of feelings.
“They want Luong to die, and they are not particularly worried about his right to a fair trial. Especially, they are not concerned about his constitutional protection from cruel and unusual punishment.
“ ‘A cruel father (who) drowned his four beautiful children should have the same thing done to him,’ another caller insisted; ‘Shackle his feet and put some weight on him and throw him overboard and let him drown with his children.’ ”
This article ended by stating that Luong was entitled to his day in court.
*117 January 20, 2008: “Who Is ... Lam Luong V’ Reported that Luong had previously turned himself into police for buying illegal drugs, that Luong had prior arrests for drug-related offenses, and that Luong’s past before he came to the United States was a mystery.
January 20, 2008: “Small Crews Search in Cold Weather for Remaining Missing Child’s Body.” Reported the problems that searchers were encountering in trying to locate the body of the fourth child.
January 21, 2008: “Sound Off” column reported that one reader had said, “Enough of Lam Lung.”
January 21, 2008: “Timeline: Two Tragic Weeks.” Reported a day-by-day account of the two weeks after January 7, 2008.
January 21, 2008: “Body Believed to be Fourth Child Found.” Reported that the body of the fourth child had been found and the extensive efforts that had been made to locate the body.
January 22, 2008: “Autopsy of Girl’s Body Set Today in Louisiana.” Reported that an autopsy would be conducted on the child’s body after she had been found in the Mississippi River and that Luong had confessed to murdering his four children and gave a synopsis of where the other three children’s bodies had been found.
January 22, 2008: “Sound Off ” column contained a quote:. “How apt that [a reporter] would quote such a negative caller to Sound Off. When she and other self-righteous people get through, and the legal process is played out, Lam Luong will be portrayed as a victim. In a sense, he is, but of his own making. I wonder if they read about each individual chid and their own little personalities. Give us the right to our opinions and outrage.”
January 23, 2008: “Body ID’d as Hannah Luong.” Reported that the child’s body discovered in the Mississippi River was Hannah’s body.
January 24, 2008: “Family to Hold Memorial for Four Children.” Invited the public to a memorial service to be held for the four victims and to a graveside service for the victims, and reported that Kieu’s family would host an appreciation dinner for the individuals who had helped in the search for the children.
January 27, 20Ó8: “Heartbreaking Final Farewell.” Reported that 600 people had attended the memorial service for the children. The article said, in part: “Cards, letters, drawings, song lyrics and a quilt hung along one wall of the community center, an outpouring of support from Bayou La Batre and across the nation.”
January 29, 2008: “Sound Off” contained the following quote: “There was a caller Sunday who said Lam Luong should get life in prison and hard labor. I suppose they think that John Wayne Gacy, Timothy McVeigh, and Ted Bundy should’ve gotten the exact same thing— just hard labor. Those people were monsters. They deserved to die, and this man who killed his children deserves the same thing. He should have to watch. They should’ve taken Lam Luong to the scene each time they found one of those little angels or at least filmed it and made him watch it over and over and over again, even if they had to forcefully hold his eyes open.”
January 30, 2008: “Sound Off” column had the following quote: “Lethal injections are on hold, so what are they going to do with Luong?”
February 3, 2008: “Family Saw Dad Changed by Drugs.” Reported how *118 Luong’s family saw his decline as a result of drug abuse.
February 11, 2008: “Crack Persists in the Bayou.” Reported, “Despite police sweeps, some struggling areas of south Mobile County continue to be ravaged by the, rocks, as evidenced by the charges against Lam Luong.”
February 11, 2008: “Volunteers on a Mission.” Reported the Mobile County Sheriffs Flotilla efforts to rescue drowning victims and individuals who had been reported missing and the efforts they had made to recover the bodies of the four children.
February 12, 2008: “Commission Gives Flotilla a Boost.” Reported that the Mobile County Sheriffs Flotilla had helped in the search' for the four children.
February 26, 2008: “Grand Jury Indicts Luong.” Reported that Luong had been indicted for five counts of capital murder and gave a synopsis of the case.
March 1, 2008: “A Journey of Living, Doing.” Reported a local pastor’s efforts to help Kieu after her children were killed.
March 2, 2008: “Fundraiser for Four Angels.” Reported that a local school had raised money for Kieu.
March 5, 2008: “Fundraiser for Four Angels.” Again reported that a local school had raised money for Kieu.
April 2, 2008: “Lam Luong Arraigned on Murder Charges.” Reported that Luong had been arraigned for five charges of capital murder. “A mental evaluation of the allegedly crack-addicted Luong could play a major role in his defense.” Also reported the “[ojffícials also agreed that efforts to move the trial venue from Mobile — in light of the public’s sympathy and outrage over the case — will be made. Graddick told the court Tuesday he believed that by the time the trial rolls around, a fair jury could be found in Mobile County, unencumbered by the wrenching news that flowed from the Gulf Coast in January.”
May 28, 2008: “Memorial for the Ages.” Reported that a permanent granite memorial had been erected in Maritime Park in Bayou La Batre in memory of the four children.
August 9, 2008: “Lam Luong’s Murder Trial Coming up in 7 Months.” Judge Graddick was quoted a saying that if a group of fair jurors could not be secured in Mobile County the case would be moved. The article also said: “The judge said everything would be done to see that, despite the publicity and emotions the children’s deaths caused in Mobile, Luong would receive an impeccable trial.”
October 15, 2008: “Defense Seeking Funding for Trip.” Reported that Luong’s attorneys were seeking funds to travel to Vietnam to investigate Luong’s childhood.
October 19, 2008: “Sound Off” section of the paper quoted a Mobile resident as saying: “Why can’t the defense lawyers for Lam Luong pay for this man’s family to come over here from Vietnam? The only reason they want to send someone over there is so they can sock it to us taxpayers.”
November 14, 2008: “Father Reconsiders Guilty Plea, Execution Wish.” Reported that Luong had indicated that he wished to be executed, that he had reconsidered, and that a psychological evaluation revealed that he wished to plead guilty. Also reported that “[w]hen [Luong] entered from a holding cell behind Graddick’s bench, five corrections officers followed him. Altogether, nearly a dozen uniformed officers stood at various posts around the *119 courtroom, as much to protect Luong as to guard him.”
December 31, 2008: “Top 10 Local Stories of this Year.” Reported that the Press-Register staff had voted Luong’s story the top story of the year.
Most of the articles cited above appeared on the front page of the Press-Register and were often accompanied by photographs of the four children, photographs of the recovery efforts, and photographs of individuals mourning the -loss of the four victims. It was reported on numerous occasions that Luong had been described by the local community as a crack addict, that the motive for the murders was revenge, that Luong had a criminal history, that Luong had been in trouble with the law in Georgia and Mississippi, that Luong had been arrested in Georgia for possessing crack cocaine, that Luong had pleaded guilty in 1997 to possessing cocaine in the State of Mississippi, that Luong had had another drug charge in 2000 but that charge was dropped, that Luong’s drug problem and his behavior were getting worse, and that Luong had said that he wanted his case to be more famous than Virginia Tech or September 11, 2001.[7]
There were articles describing the impact of the crime on the community and the community’s efforts to come to terms with the ramifications of Luong’s actions. There was extensive publicity concerning the community’s involvement in the case and the recovery efforts the community had undertaken to find the bodies of the four children. At one point over 150 people, mostly volunteers, helped with the recovery efforts, and the newspaper asked all owners of property near the water to walk their properties. A local cemetery donated the plots for the children to be buried and set aside a plot for the children’s mother. A local school raised money for the mother. A permanent memorial was erected at Maritime Park in Bayou La Batre to honor the children. The community was invited to the graveside service for the children, the family of the victims hosted an appreciation dinner for the volunteers who had searched for the children’s bodies, and a moment of silence was observed at a Mardi Gras parade to honor the children. Individuals indicated how consumed the Mobile community had , become with the tragedy and the anger and outrage that the community felt toward Luong. .
Luong’s case also received extensive local television coverage. Bob Cashen, news director for local FOX affiliate WALA-TV, Channel 10, stated that his station aired 143 news segments related to the murders. Christian Stapleton, the custodian of records for local CBS affiliate WKRG, Channel 5, stated that 442 stories had been aired concerning the case from January 2008 through January 2009. (C.R.844.) Wes Finley, news director for local NBC affiliate WPMI, Channel 15, furnished a list of 93 stories that had been aired about the case. WKRG also hosted an online forum concerning the murders entitled “Children Thrown from the Bridge.” One topic in this forum entitled “How Should the Baby Killer be Dealt With” was viewed over 16,000 times.
“ ‘[A] presumption of prejudice ... requires the presence of exceptional circumstances,’ e.g., whether the publicity consisted of sensational, inflammatory, and slanted articles demanding convic *120 tion; whether it revealed the existence of the defendant’s prior criminal record; whether it referred to the defendant’s confessions or admissions of the crime; and whether it is the product of police or prosecutorial reports. [Commonwealth v. Casper, 481 Pa. 143], 392 A.2d at 292 [ (1978) ] (citations omitted). ‘Should any of the above elements be found, the next step of the inquiry is to determine whether such publicity has been so extensive, so sustained and so pervasive that the community must be deemed to have been saturated with it.’ Id.”
Commonwealth v. Young, 561 Pa. 34, 66, 748 A.2d 166, 183 (1999). “The Court has considered whether the associated media coverage has included a ‘confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight.’” Price v. Allen, 679 F.3d 1315, 1321 (11th Cir.2012).
“[T]he pertinent question in determining whether publicity is ‘inflammatory’ is not simply whether the media reports contain ‘editorializing,’ whether they wei*e ‘calculated’ to achieve a sinister purpose, or whether they report- ‘factual’ information. Although these are relevant factors, the focus must be on the publicity’s likely effect on the jury pool. Thus, we take this opportunity to clarify the meaning of ‘inflammatory’ publicity for purposes of the pretrial-publicity test. ‘Inflammatory' publicity is publicity which, by its nature, has the tendency to stir up in the community pervasive and strong passions of anger, hatred, indignation, revulsion, and upset such that there are reasonable grounds to believe that jurors chosen from this community could not determine the defendant’s guilt or innocence in a fair and unbiased manner and based solely upon the evidence admitted at trial.”
State v. Devlin, 349 Mont. 67, 75-76, 201 P.3d 791, 797 (2009).
Although a great deal of the media coverage of the crimes was factual in nature, a great deal was also inflammatory and consisted of personal attacks against Luong and comments concerning what Luong’s punishment should be. Based on the media coverage, it would appear that Luong was tried and convicted before, his trial.
(3) Timing of the Media Coverage
The majority of the media coverage occurred in January 2008 during the first month after the murders. Numerous articles were also published in November and December 2008 and during the voir dire proceedings in March 2009.
“Alabama courts have held that the passage of time is a factor that can bring objectivity to a case in which the pretrial publicity has been extensive,” Ex parte Travis, 776 So.2d 874, 878 (Ala.2000). However, the “proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.” Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App.1978). No extensive voir dire examination was conducted on the issue of pretrial publicity.
Unlike the jury in Skilling, the jury in this case did not acquit Luong of any charge; instead, the jury convicted Luong of all five counts of capital murder as charged in the indictment.
(4) Media Interference
Before Luong’s trial began the circuit court indicated that it had been approached by media outlets and asked if cameras could be used in the courtroom to stream the trial proceedings live. (R. 341.) The circuit court indicated that it would not grant that request if any party objected. The district attorney objected and *121 indicated that he had informed local media and one national media outlet that he objected to the use of cameras in the courtroom. (R. 342.) The circuit court ruled that no cameras or recording equipment could be used in the courtroom. (R. 342.)
• During voir dire examination, after the circuit court excused one juror based on his belief that Luong should be sentenced to death, the circuit court stated: “We’re going to take you out the back because it is my understanding the news media is trying to interview people who have been excused. And I’d just soon not subject you to that.” (R. 865.)
Counsel also noted when requesting individual voir dire that publicity around the case had been extensive after Luong decided to withdraw his plea of guilty the week before the scheduled trial.

Analysis

Based on the record before us, it is clear that publicity surrounding the murders completely saturated the Mobile community in 2008. A great deal of that publicity was prejudicial. The coverage consisted of Luong’s prior criminal history, Luong’s confession, Luong’s desire to plead guilty, Luong’s decision to withdraw his guilty plea, the community’s outrage over the death of the four children, and what the community- believed should be Luong’s punishment. At the time of Luong’s trial, the case was still of great interest to the public. The record indicates that, when 11 jurors were individually questioned about a comment they had made that Luong should be sentenced to death, it was clear that the media coverage of the case was still prominent in the minds of these jurors. What distinguished this case from the average case was not only the extensive and pervasive publicity but also the public’s involvement in all aspects of the case — from efforts to recover the victims to opinions on what punishment Luong should receive.
In State v. James, 767 P.2d 549 (Utah 1989), the Utah Supreme Court addressed an interlocutory appeal involving the circuit court’s denial of James’s motion for a change of venue after James was charged with murdering his three-month-old child by throwing the infant into a river. In holding that the lower court erred in denying James’s motion for a change of venue, the Utah Supreme Court found that the community involvement in the case was so great that a change of venue was necessary to protect James’s right to an impartial jury. The court stated:
“[Ajnother factor ... clinches our belief that a reasonable likelihood exists that defendant cannot receive a fair and impartial' trial in Cache County. Unlike any case which has come before this Court where it has been contended that a change of venue should have been granted, in the instant case there was a widespread community effort to locate the missing child. This effort touched many adults, schoolchildren, and businesses. They responded with money, material, and countless hours of labor. This community involvement brought many people much closer to this alleged crime than ordinarily occurs. One television news story reported that the events had ‘touched the community at its very core’; another news release quoted a Logan resident as saying, We’re-all taking this very personally. It’s as though someone has violated our homes ... our families.’ In State v. Wood, 648 P.2d 71 (Utah 1982), State v. Pierre, 572 P.2d 1338 (Utah 1977), cert. denied, 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978), State v, Lafferty, 749 P.2d 1239 (Utah 1988), and State v. Bishop, 753 P.2d 439 (Utah 1988), all recent capital murder cases in which we held that the trial court had not abused its discretion in *122 denying motions for change of venue even though the crime in each case was heinous and aroused many of the populace, there was no community involvement. We believe this involvement gives the instant ease a very different dimension and accentuates the difficulty in seating a jury which has not been touched in some way, either directly or through family or friends, with this crime, which played a prominent part in the lives of Cache County residents for a month and one-half.”
767 P.2d at 554-55. See also Annot., Peter G. Guthrie, J.D., Pretrial Publicity in Criminal Cases as Ground for Change of Venue, 33 A.L.R.3d 17 (1970).
This Court is convinced that Luong’s case represents one of those rare instances where prejudice must be presumed. Seldom does a community experience a crime as incomprehensible as the one here, where a father is accused and convicted of murdering his four children by throwing them off a bridge. Clearly, the extensive media coverage aroused passions, outrage, and anger toward Luong. The sentiment displayed by the public in editorials and comments in the “Sound Off’ column of the local paper evidenced the public’s clear animosity toward Luong. The community involvement in this case “accentuated] the difficulty in seating a jury which ha[d] not been touched in some way, either directly or through family op friends, with this crime which played ⅝ prominent part in the lives of [Mobile] County residents for [months].” 767 P.2d at 555.
B. . Actual Prejudice
Luong further argues that, even if he failed to establish presumed prejudice, the circuit court precluded him from showing actual prejudice because, he says, the circuit court withdrew its early ruling allowing individual voir dire examination and merely asked the jurors, as a whole, a few questions related to the media coverage of the case. For the foregoing reasons, we must agree.
“Tn Alabama, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination. This rule applies to capital cases, and the granting of a request for individual voir dire is discretionary with the trial court.’ Coral v. State, 628 So.2d 954, 968 (Ala.Cr.App.1992). ‘The fact that the appellant’s case involved capital murder is not alone reason to require individual voir dire .... A trial court’s decision in denying individual voir dire examination of a jury panel will not be disturbed on appeal absent an abuse of that discertion.’ Smith v. State, 588 So.2d 561, 579 (Ala.Cr.App.1991). See also Henderson v. State, 583 So.2d 276, 283 (Ala.Cr.App.1990), affirmed, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992).”
Taylor v. State, 666 So.2d 36, 66 (Ala.Crim.App.1994). Although we have recognized that a trial judge has discretion to conduct individual voir dire, this Court has also recognized that
“[t]his discretion is limited, however, by the requirements of due process. United States v. Hawkins, 658 F.2d 279 (5th Cir.1981); Waldrop v. State [, 462 So.2d 1021 (Ala.Crim.App.1984) ] Individual questioning may be necessary under some circumstances to ensure that all prejudice has been exposed.”
Haney v. State, 603 So.2d 368, 402 (Ala.Crim.App.1991). “It is the voir dire process through which the influence of pretrial publicity is tested as to individual jurors.” United States v. Jamieson, 264 F.Supp.2d 603, 606 (N.D.Ohio 2003). “No hard-and-fast formula dictates the neces *123 sary depth or breadth of voir dire.” Skilling, 561 U.S. at 362, 130 S.Ct. at 2917. However,
“Questions on voir dire must be sufficient to identify prospective jurors who hold views that would prevent or substantially impair them from performing the duties required of jurors. Morgan, [v. Illinois] 504 U.S. [719] at 734-735, 112 S.Ct. 2222, 119 L.Ed.2d 492 [(1992)]. Moreover, the fact that defendant bears the burden of establishing juror partiality, see Wainwright v. Witt, 469 U.S. [412] at 423, 105 S.Ct. 844, 83 L.Ed.2d 841 [ (1985) ], makes it all the more imperative that a defendant be entitled to meaningful examination at voir dire in order to elicit potential biases held by prospective jurors. Mu’Min v. Virginia, 500 U.S. [415] at 441, 111 S.Ct. 1899, 114 L.Ed.2d 493 [(1991)] (Marshall, J., dissenting)."
State v. Jackson, 107 Ohio St.3d 53, 64, 836 N.E.2d 1173, 1191 (2005). See also United States v. Guy, 924 F.2d 702, 707 (7th Cir.1991).
Courts have condemned the use of general voir dire questions concerning pretrial publicity when the majority of the jurors have been exposed to publicity surrounding a' case. The United States Court of Appeals for the Eleventh Circuit in Cummings v. Dugger, 862 F.2d 1504 (11th Cir.1989), stated:
“[I]n a case where all the jurors had been exposed to some pretrial publicity, simply asking members of the jury veni-re to indicate by a show of hands whether the publicity would impair their ability to render an impartial decision did not adequately protect the defendant’s constitutional rights. [United States v. Davis, 583 F.2d 190] at 196 [ (1978) ].”
862 F.2d at 1507-08.
The United States Court of Appeals for the Fifth Circuit in United States v. Hawkins, 658 F.2d 279 (5th Cir.1981), stated:
“As in [United States v.] Davis, [583 F.2d 190 (5th Cir.1978), ] this Court is compelled to conclude that, in light of the nature and extent of the pretrial publicity surrounding this case, and the fact that forty-eight of the fifty-six potential jurors acknowledged some exposure to the publicity, the district court’s abbreviated treatment of this issue simply does not afford ‘a reasonable assurance that prejudice would (have been) discovered if present.’ United States v. Delval, 600 F.2d [1098] at 1102 [(5th Cir.1979)], quoting United States v. Nell, 52[6] F.2d [1223] at 1229 [(5th Cir.1979) ]. Contrary to the district court’s observation that a specific inquiry into what each affected juror had read or heard was ‘insignificant and not important,’ the clear teaching of Davis is that, when a significant possibility exists that a juror will be ineligible to serve because of potentially prejudicial publicity, it is the obligation of the district court to determine whether that juror can lay aside any impression or opinion due to the exposure. Of course, this does not mean that every case involving exposure to pretrial publicity automatically requires the ‘time consuming, probing, preferably individual voir dire described in Davis’ United States v. Gerald, 624 F.2d [1291] at 1298 [ (5th Cir.1980) ]; nor does it mean that such an examination, when necessary, must always be conducted apart from the other jurors. As in Davis, ‘(w)e recognize the district court’s need for flexibility in interrogating jurors as to possible prejudice.’ 583 F.2d at 197. What it does mean, however, is that when the nature of the publicity as a whole raises a significant possibility of prejudice, and a juror acknowledges some exposure to that publicity, more than the abbreviated questioning conducted in Davis and *124 in the ease sub judice is necessary: ‘The juror is poorly placed to make a determination as to his own impartiality. Instead, the trial court should make this determination.’ 583 F.2d at 190, Consequently, our conclusion that, the district court’s inquiry was, under Davis, insufficient to reveal possible juror prejudice, requires reversal of the convictions of appellants.... ”
658 F.2d at 285. See Commonwealth v. Toolan, 460 Mass. 452, 468, 951 N.E.2d 903, 918 (2011) (“Where potential jurors have had pretrial exposure to a case, individual voir dire is the means by which a judge can distinguish between mere exposure and bias.”); State v. Howell, 868 S.W.2d 238, 247 (Tenn.1993) (“Where the crime is highly publicized, the better procedure is to grant the defendants individual, sequestered, voir dire, but it is only where there is a ‘significant possibility’ that a juror has been exposed to potentially prejudicial material that individual voir dire is mandated.”).
In this case, the nature and extent of the media coverage mandated that individual voir dire be conducted. It was the circuit court’s “duty to inquire about [the media’s] impact upon the veniremen.... ” United States v. Sawyers, 423 F.2d 1335, 1344 (4th Cir.1970). This Court cannot conceive of a case where individual voir dire was more necessary or essential than in this case.
For the above reasons, we have no choice but to find that the circuit court erred in denying Luong’s motion for a change of venue and that the circuit court abused its discretion in denying Luong’s request for individual voir dire concerning the effects of the prejudicial pretrial publicity on the jurors’ ability to be impartial. Luong was denied his constitutional right to an impartial jury. Therefore, we must reverse Luong’s convictions and sentence of death and remand this case for a new trial.
Although the circuit court’s actions with regard to the motion for a change of venue and the motion for individual voir dire mandate that Luong’s convictions be reversed, we take this opportunity to address several issues raised by Luong that may arise in any subsequent proceedings.
II.
Luong argues that the circuit court erred in not approving extraordinary expenses so that his attorneys could travel to Vietnam to interview his mother and other family members, to investigate mitigation evidence. Luong lived in Vietnam until he was 13 years of age.
The record indicates that Luong filed an ex parte motion requesting $12,000 so his attorneys could travel to Vietnam with the assistance of Dr. Paul Leung, a Vietnam native and a mitigation expert, to interview Luong’s family members and friends. (C.R.218.) Luong stated in the motion that: “Dr. Paul Leung advises that the information possessed by these potential witnesses is necessary for the completion of his evaluation and would be relevant mitigation material.” (C.R.220.) Attached to the motion is an affidavit executed by Dr. Leung. Dr. Leung wrote:
“Mr. Luong’s childhood and adolescent experiences during the years he spent in Vietnam are important mitigation factors if Mr. Luong faces a death penalty prosecution. According to Lam Luong he was born October 5, 1970 in Vinh Long Province, Vietnam. His birth was the result of a brief relationship between a black American serviceman serving in the Vietnam War and his Vietnamese mother who lived in Saigon [now Ho Chi Minh City], After his birth he was given to his maternal grandparents to raise in *125 the country away from Saigon. He remained with the grandparents until he was nine years old when he joined his mother, a step-sister, and a stepfather in Saigon. Lam Luong came to the United States when he was fourteen [8] years old and he and a few of his cousins lived with a family under the Unaccompanied Minor Program run by Catholic Charities in Jersey City, New Jersey. ... I am of the opinion that Lam Luong’s childhood and adolescence spent in Vietnam is significant mitigation evidence. Vietnamese society is generally cruel in its treatment of Amerasian children, especially black Amerasians, and they are often ostracized and banished from society. Lam Luong is a black Amerasian and his personal history reveals he was treated much like other Amerasian children born before the fall of Saigon in 1975.”
(C.R.223-25.)
At a pretrial hearing, the circuit court indicated that it believed that it was not necessary for counsel to go to Vietnam and that the attorneys could use teleconferencing as a means of communicating with Luong’s family. Counsel argued that, according to the American Bar Association guidelines for counsel representing a capital-murder defendant and the United States Supreme Court’s decision in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), they were obligated to research Luong’s childhood and background for possible mitigation evidence. Counsel further indicated that Luong was raised in a small rural village about two hours outside of Ho Chi Minh City. Counsel asked the court to withhold ruling on the motion until it could investigate whether teleconferencing was possible.
At a subsequent pretrial hearing, counsel argued as follows:
“[Luong] was taken from his mother and taken tó Vinh Long Province to live with his grandparents. The communists — when the communists took over in 1975, they don’t allow them tó educate these children, they don’t want them in their society, they don’t want them in any of their programs, they don’t want anything to do with them.
[[Image here]]
“[Luong] came here as part of an unaccompanied minors program when he was 13 years old. He has very little — he has two 'family members here that he hasn’t seen — very little of since they both came over here on the same program. And they are going. So his entire family remains in Vietnam.
“The only person we have any real contact and control over is the mother. And she is in [Ho Chi Minh City, formerly Saigon], She is poor. She doesn’t have the wherewithal to do what we need to do to investigate — both investigate and perpetuate testimony in Vinh Long Province.
[[Image here]]
“There is no way, Judge, according to Ms. Cook, that those individual witnesses in the rural area where he grew up, there is no way for them to get to [Ho Chi Minh City], even if they had the wherewithal to do it, which they don’t.”
(R. 110-12.) At this hearing, counsel reduced his request for funds to $7,500 because, they said, they were not going to use Dr. Leung’s services while in Vietnam, Counsel stated that they intended to per *126 sonally interview Luang’s mother, his six aunts, and numerous cousins who lived in and around Ho Chi Minh City and to obtain the services of a local interpreter who they discovered would be more cost efficient than using Dr. Leung. The circuit court stated that it believed that counsel could conduct the interviews by teleconference, that counsel was going on a “fishing expedition,” and that it would not approve expenses for counsel to go to Vietnam to investigate Ling’s childhood. (R. 170.)
Section 15-12-21, Ala.Code 1975, governs the compensation of counsel appointed to represent an indigent in Alabama. At the time of Luong’s trial, § 15-12-21(d), Ala.Code 1975, read:
“(d) Counsel appointed in [indigent] cases ... shall be entitled to receive for their services a fee to be approved by the trial court. The amount of such fee shall be based on the number of hours spent by the attorney in working on such case and shall be computed at the rate of $40.00 per hour for time expended in court and $20.00 per hour for time reasonably expended out of court in the preparation of such case. The total fees to any one attorney in any one case, from the time of appointment through the trial of the case, including motions for new trial, shall not, however, exceed $1,000.00, except as follows: In cases where the original case involves a capital offense or a charge which carries a possible sentence of life without parole, the limits shall be $1,000.00 for out-of-court work, plus payment for all in-court work, said work to be billed at the aforementioned rates. Counsel shall also be entitled to be reimbursed for any expenses reasonably incurred in such defense to be approved in advance by the trial court. Retrials of a case shall be considered a new case.”
In 2011, § 15-12-21(d), Ala.Code 1975, was amended; it now reads, in pertinent part:
“Counsel shall also be entitled to be reimbursed for any nonoverhead expenses reasonably incurred in the representation of his or her client, with any expense in excess of three hundred dollars ($300) subject to advance approval by the trial court as necessary for the indigent defense services and as a reasonable cost or expense. Reimbursable expenses shall not include overhead expenses. Fees and expenses of all experts, investigators, and others rendering indigent services to be used by counsel for an indigent defendant shall be approved in advance by the trial court as necessary for the indigent defense services and as a reasonable cost or expense.”
There is very little law in Alabama on what constitutes reasonable expenses under § 15-12-21(d), Ala.Code 1975. In May v. State, 672 So.2d 1307 (Ala.Crim.App.1993), this Court addressed whether office overheard was a reasonable expense under § 15-12-21, and stated:
“In Robinson v. State, 584 So.2d 533 (Ala.Cr.App.), cert. denied, 584 So.2d 542 (Ala.1991),.this court said that § 15-12-21(d) ‘ “clearly authorizes reimbursement for any expenses reasonably incurred in the defense of an indigent by a court appointed attorney.”’ 584 So.2d at 537, quoting Bailey v. State, 421 So.2d 1364, 1367 (Ala.Cr.App.1982).
“‘Although § 15-12-21(d) authorizes payment of court-approved expenses, “[t]he trial judge must find some reasonable basis for the expenditure of state funds before he may authorize” payment under the statute, Wiggins v. State, 440 So.2d 1164, 1167 (Ala.Cr.App.1983).’
*127 “Whittle v. State, 518 So.2d 793, 794 (Ala.Cr.App.1987).”
672 So.2d at 1308.
In State v. Bui, 888 So.2d 1227 (Ala.2004), the Alabama Supreme Court reviewed the State’s petition for a writ of mandamus after the circuit court approved $54,000 in funds so that defense counsel could travel to Vietnam to conduct a mitigation investigation for Bui’s retrial on capital-murder charges. The State asserted that it should have been given the opportunity to respond to Bui’s motion for approval of the extraordinary expenses. In issuing the writ of mandamus, the Supreme Court stated:
“While we recognize defense counsel’s obligation to conduct a thorough investigation of a defendant’s background, the trial court must consider the reasonableness of the investigation. In Wiggins v. Smith, 539 U.S. 510, 527, 123 S.Ct. 2527, 2538, 156 L.Ed.2d 471 (2003), the United States Supreme Court stated:
“ ‘In assessing the reasonableness of an attorney’s investigation, ... a court must consider not only the quantum of the evidence already known to counsel, but whether the known evidence would lead a reasonable attorney to investigate further.’ ”
State v. Bui, 888 So.2d 1227, 1230 (Ala.2004). Bui, however, is factually distinguishable from the one here in that the Supreme Court’s decision was based on the fact that Bui’s counsel in his first trial had been granted funds to travel to Vietnam to investigate Bui’s background and that counsel in the second trial had failed to give adequate reasons why a second trip to Vietnam was necessary.
If convicted Luong faced the ultimate punishment — death. Based on the severity of the penalty and the necessity of presenting mitigating evidence in the penalty phase of a capital-murder trial, it was reasonable and prudent for counsel to request funds to investigate Luong’s difficult childhood in Vietnam. Moreover, the sum requested by counsel, $7,500, was not unreasonable. The circuit court erred in denying Luong’s request for reasonable expenses to travel to Vietnam to investigate Luong’s childhood.
III.
Luong further argues that the record is incomplete because, he says, a portion of the voir dire examination of the prospective jurors was not included in the record on appeal. Specifically, Luong argues: “The instructions from the first day are relevant to numerous points of error alleged in this appeal. The judge may have also instructed the jurors that Luong had pled guilty.” (Luong’s brief at p. 127-28.)
After the transcript of Luong’s trial was filed with this Court, Luong moved that the record be supplemented with the proceedings held on March 9, 2009. The case-action-summary sheet indicates that jury selection began on that date. (C.R.14.) When denying the motion to supplement the record, the circuit court stated:
“There were no in-court or in-chambers proceedings held on this date. This Court went to the jury assembly room, instructed the prospective jurors to fill out the individual juror questionnaire, turn them in to court personnel and ordered the prospective jurors to return on Wednesday, March 11, 2009, for the jury selection process.”
(Suppl. R. 27.)
Luong asserts that jury selection began on March 9, 2009, when the jurors completed questionnaires. However, the State asserts that voir dire of the jury did not begin until March 11, 2009, when oral voir dire examination began.
*128 Rule 19.4(a), Ala. R.Crim. P., specifically provides:
“In all capital cases (criminal trials in which the defendant is charged with a death penalty offense), the court reporter shall take full stenographic notes of voir dire of the jury and of the arguments of counsel, whether or not such is ordered by the judge or requested by the prosecution or defense. This duty may not be abrogated by the judge or waived by the defendant.”[9]
(Emphasis added.)
In addressing the scope of this Rule, the Alabama Supreme Court has stated:
“Although Land claims error in the lack of a transcript of the court’s selection of the venire and of the actual striking of the jury, Rule 19.4(a) requires only transcription of the ‘voir dire of the venire,’ which was transcribed in full and which is part of the record in this case. Nor does Rule 19.4(a) require transcription of the polling of the jury. The transcript shows that both following the jury foreman’s pronouncement of the jury’s finding as to guilt and then later following the foreman’s pronouncement of the jury’s recommended sentence, the court reporter made a contemporaneous notation indicating that the judge polled the jury.”
Ex parte Land, 678 So.2d 224, 245 (Ala.1996).[10]
. “Because the purpose behind juror questionnaires is merely to expedite the examination of prospective jurors, it follows that such questionnaires are part of the voir dire process.” State ex rel. Beacon Journal Publ. Co. v. Bond, 98 Ohio St.3d 146, 781 N.E.2d 180 (2002). “It is clear that when the court distributed the questionnaires to the venirepersons with instructions to fill them out, voir due had begun. The fact that the questioning of jurors was largely done in written form rather than orally is of no constitutional import.” Copley Press, Inc. v. Superior Court, 228 Cal.App.3d 77, 89, 278 Cal.Rptr. 443, 451 (1991). See also Huber v. Rohrig, 280 Neb. 868, 791 N.W.2d 590 (2010). “[A] written questionnaire serves as an alternative to oral disclosure of the same information in open court and is, therefore, synonymous with, and a part of, voir dire.” Forum Commc’ns Co. v. Paulson, 752 N.W.2d 177, 185 (N.D.2008).
“Although voir dire ordinarily contemplates seeing the jurors and' hearing them speak, see generally Cardinal v. Gorczyk, 81 F.3d 18, 20 (2d Cir.1996) (referencing a defendant’s right to ‘see and hear’ prospective jurors during voir dire), any court-supervised examination of prospective jurors is reasonably understood to be part of voir dire. District courts routinely employ questionnaires to facilitate voir dire in a number of circumstances, e.g., where a large number of prospective jurors must be screened, see, e.g., United States v. Rahman, 189 F.3d 88, 121 (2d Cir.1999) (approving court’s use of comprehensive questionnaire in case involving over 500 prospective jurors); where an anonymous jury is to be empaneled, see, e.g., United States v. Thai, 29 F.3d [785] at 801 [(2d Cir.1994)]; where there has been extensive pre-trial publicity, see, e.g., United States v. Stewart, 433 F.3d [273] at 303 [ (2d Cir.2006) ]; or where the death penalty is sought, see, e.g., United States v. Wilson, 493 F.Supp.2d *129 537, 544 (E.D.N.Y.2007) (observing, in a capital case, that ‘[n]early 600 potential jurors came to this courtroom to fill out 56-page questionnaires prepared by the parties and by the court’); see also United States v. McVeigh, 153 F.3d 1166, 1181 (10th Cir.1998). The use of such a procedure, as a preliminary screening tool falls well within the dis-triet court’s broad discretion in conducting voir dire. See generally United States v. Rahman, 189 F.3d at 121-22 (holding, where district court removed some potential jurors for cause based on responses to questionnaires while conducting oral voir dire of remaining venirepersons, that court’s ‘voir dire skillfully balanced the difficult task of questioning such a large jury pool with the defendants’ right to inquire into the sensitive issues that might arise in the case’); United States v. Contreras, 108 F.3d 1255, 1269-70 (10th Cir.1997) (sanctioning removal of prospective jurors for cause in non-capital cases based on questionnaire responses); United States v. Paradies, 98 F.3d 1266, 1277-81 (11th Cir.1996) (same).”
United States v. Quinones, 511 F.3d 289, 299-300 (2d Cir.2007).
Rule 19.4, Ala. R.Crim. P., provides that the court reporter shall take “full stenographic notes of the voir dire” in all death-penalty cases. The completion of a juror questionnaire related to a specific case is part of the voir dire process; thus, according to Rule 19.4, Ala. R.Crim. P., the court’s instructions related to those questionnaires should be recorded and transcribed by the court reporter.
IV.
Luong further argues that the circuit court erred in allowing a videotape of Cpt. Darryl Wilson throwing sandbags off of the Dauphin Island Bridge to be admitted into evidence during the penalty phase. Specifically, he argues that the admission of the videotape and testimony concerning Cpt. Wilson’s simulation was erroneous because, he says, Cpt. Wilson was not offered as an expert witness and the experiment was a scientific experiment that should have been conducted by an expert.
Immediately before the penalty phase, defense counsel objected to the State’s attempt to admit a videotaped experiment that showed Cpt. Wilson throwing four sandbags off the Dauphin Island Bridge. Defense counsel stated that the videotape was more prejudicial than probative,’ that the conditions on the day of the experiment were different than those on the day of the murders, and that the conditions could have affected the rate of descent of the bodies. Luong also argued that the experiment was a scientific experiment that required the testimony of an expert witness. The State asserted that the videotape was admissible in the penalty phase to establish the aggravating circumstance that the murders were especially heinous, atrocious, or cruel because the videotape showed the force with which the bodies hit the water. The circuit court állowed the videotape to be admitted into evidence. (R. 1506.) ■
During the penalty phase of Luong’s trial, Cpt. Wilson testified that he conducted an experiment by using sandbags that corresponded to the different weights of. the children and that he threw them individually off the Dauphin Island Bridge.[11] He testified that he used a conversion chart that he had obtained on the *130 Internet to calculate the speed at which each child hit the water. Cpt. Wilson testified that the children were descending and hit the water at a rate of 25 miles per hour. (R. 1533.)
“The party offering in evidence the results of an experiment must surmount the hurdle presented by the test of ‘substantial similarity.’ It has been held that evidence of an experiment, conducted out of court and having probative value on a matter in issue, is admissible if the conditions of the experiment were substantially similar to the conditions existing at the time of the occurrence involved in the litigation. Whether this condition of similarity has been met is a question left largely to the discretion of the trial judge.”
Charles Gamble and Robert Goodwin, McElroy’s Alabama Evidence, § 81.01(2) (6th ed 2009) (footnotes omitted).
“However, before the demonstration, the trial court should determine if the prejudicial effect of the demonstration substantially outweighs its probative value. Even if the trial court finds the demonstration to be relevant and helpful to the jury, the trial court may still exclude it if the probative value is substantially outweighed by the danger of unfair prejudice.”
Minor v. State, 780 So.2d 707, 763 (Ala.Crim.App.1999), rev’d on other grounds, 780 So.2d 796 (Ala.2000). “There must be a similarity of condition to give an experiment probative value sufficient to warrant its admission at trial. Dissimilarity of essential particulars between the test and actual conditions require that such evidence be rejected.” Gilley v. State, 367 So.2d 597, 599 (Ala.Crim.App.1978).
Moreover, when an experiment is videotaped and the videotape is admitted at trial the proponent must also lay a proper foundation for the admission of the recording.
“[Bjecause a filmed reenactment of a particular event is a type of evidence which has the potential to cause great prejudice, a court should exercise caution when ruling upon the admissibility of a filmed reenactment in a criminal case. Most jurisdictions that have admitted filmed reenactments' as evidence in a criminal case have required the proponent of this evidence to lay a proper foundation showing that the video tape or film accurately portrays the event in question. See State v. Trahan, 543 So.2d 984, 997 (La.App. 3d Cir.), rev’d on other grounds, 551 So.2d 1303 n. 3 (La.1989); Morgan v. State, 518 So.2d 186, 189 (Ala.Crim.App.1987); State v. Tillinghast, 465 A.2d 191, 19(R.I.1983); see also Annotation, Admissibility of Videotape Film in Evidence in Criminal Trial, 60 A.L.R.3d 333, 337 (1974) (stating that ‘it is generally recognized that before a videotape film can be admitted as evidence a proper foundation of its authenticity and accuracy must be laid’). Additionally, the proponent must establish that the reenactment was filmed under conditions substantially similar to those existing at the time of the event. Tillinghast supra.”
State v. Leroux, 133 N.H. 781, 784-85, 584 A.2d 778, 780-81 (1990). “The strong impact of seeing an inaccurate reenactment creates such a substantial possibility of prejudice that it is unlikely cross-examination could effectively point out the discrepancies.” State v. Trahan, 576 So.2d 1, 8 (La.1990).
In this case Cpt. Wilson offered no testimony concerning the similarities of the experiment and the events that took place on January 7, 2008. Indeed, we question whether that test could be satisfied in this case, given the many variables *131 that could exist with the use of sandbags as bodies. Nor was any testimony presented concerning the proper foundation for the admission of the videotape.
Further, Opt. Wilson testified concerning the rate of speed of the falling bodies based on a scientific formula that he said he obtained on the Internet. Cpt. Wilson had no scientific knowledge of the computation of this formula or what conditions, if any, could affect that computation.
According to Rule 702, Ala. R. Evid.:
“(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.”
“When a witness presents information that is outside the working knowledge of an average lay person, then the need for an expert exists.” United States v. Lawson (No. 3:08-21-DCR) (E.D.Ky. May 1, 2009) (not reported in F.Supp.2d ), citing United States v. White, 492 F.3d 380, 403 (6th Cir.2007). “The function of an expert is to ‘provide testimony on subjects that are beyond the common sense, experience and education of the average juror.’ ” Felder v. Physiotherapy Assocs., 215 Ariz. 154, 165, 158 P.3d 877, 888 (2007). “Trial court should admit expert téstimony if relying on the ‘ “knowledge and application of principles of physics, engineering, and other sciences [is] beyond the ken of the average juror.” ’ ” Denham v. Holmes, 60 So.3d 773, 787 (Miss.2011), citing 9 Am.Jur.3d Proof of Facts § 115, 4 (2010). We can locate no caselaw allowing a layperson to testify concerning the rate of acceleration of a falling body. Certainly matters of physics and velocity are not matters within the. common knowledge of an average juror; See State v. Mann, 129 N.M. 600, 604, 11 P.3d 564, 568 (2000)(“The expert witness testified regarding the mechanics, including the speed of falling bodies.-... ”); Mathews v. Chrysler Realty Corp., 627 S.W.2d 314 (1982) (expert testified to force of falling body); Texas Employer’s Ins. Ass’n v. Gregory, 521 S.W.2d 898, 900 (Tex.Civ.App.1975), rev’d on other grounds, 530 S.W.2d 105 (Tex.1975) (the expert “testified ... applying the laws of physics as to falling objects” that the body would have been traveling at a speed of 9-15 miles per hour); Gose v. True, 197 Iowa 1094, 198 N.W. 528 (1924) (expert testified concerning force of impact of the vehicle as compared to the impact of falling body).
Section 13A-5-45(d), Ala. Code 1975, governs the admission of evidence at the penalty phase of a capital-murder trial. This section provides:
“Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or .the State of Alabama.”
This Court realizes that “[i]n the conduct of the sentencing hearing, the rules of evidence [are] relaxed.... ” Harris v. State, 352 So.2d 479 (Ala.1977). However, this does not absolve the State from establishing that the evidence offered at the penalty phase of a capital-murder trial is probative and relevant to a defen *132 dant’s sentence. Because there was no testimony that showed that the experiment was similar to the actual events that occurred on the Dauphin Island Bridge, the admission of evidence of Opt, Wilson’s experiment was not relevant to or probative of the issue of Luong’s sentencing.
V.
Luong next argues that the interpreter hired to assist counsel in communicating with him was inadequate and unreliable. Specifically, he asserts that the interpreter was not certified or registered in Alabama and that his interpretations were inadequate and unreliable.
The record indicates that in March 2008 Luong moved for funds so that he could hire a Vietnamese-speaking interpreter to assist counsel in communicating with Luong. (C.R.76-77.) Luong had an interpreter at his arraignment in April 2008.[12] (R. 17.) In November 2008, counsel requested that the court allow him to contact the court’s interpreter or the interpreter who would interpret the trial proceedings. At this hearing, Luong indicated that the Alabama Administrative Office of Courts (“AOC”) had recently adopted new policies regarding foreign-language interpreters and that those procedures provided that interpreters be registered with AOC so that a background check could be conducted. See Policies and Procedures for Foreign Language Interpreters. The circuit court indicated that before trial the interpreter he appointed needed to register with AOC. (R. 183.) The record indicates that the court gave the interpreter an oath; however, the contents of that oath is not contained in the record. (R. 967.)
Section 15-l-3(a), Ala.Code 1975, addresses the use of foreign-language interpreters and provides, in part:
“(3) If the court determines that due process considerations require an interpreter, the court shall appoint a qualified person to interpret the proceedings for the defendant, juvenile, or witness requesting assistance. The interpreter shall also interpret the testimony or statements of the defendant, juvenile, or witness, and, where applicable, assist in communications with counsel.”
As this Court noted in Albarran v. State, 96 So.3d 131 (Ala.Crim.App.2011), Alabama has no statute requiring that interpreters be certified. However, effective October 1, 2008, AOC, under the direction of then Chief Justice Sue Bell Cobb, adopted a 25-page policy regarding the use of interpreters in Alabama courts. These guidelines provide that an interpreter should be registered with AOC, that the interpreter should be administered an oath by the court, that the interpreter should be given certain instructions regarding his or her function, that a noncertified interpreter may be appointed but that that interpreter should be given more detailed instructions than a certified interpreter, and that the interpreter must abide by the Foreign Language Interpreters’ Code of Professional Responsibility. These guidelines further provide that “In all cases, the record should reflect the interpreter’s oath and/or the adequacy of the interpreter’s prior written oath.” Section 6, F. Oath.
The record in this case reflects that the interpreter was given an oath but the oath was not transcribed into the record. Neither are there any documents showing that the interpreter was registered with AOC or that the interpreter had been given any specific instructions regarding his conduct during the court proceedings. Section 10, E.[13]
*133 The record further reflects that the State’s first three witnesses during the guilt phase relied on the services of the court interpreter. Luong argues that the translations of their testimony was inadequate. A review of the record indicates that at one point when the State’s first witness, Dung Ngoc Dhi Phan, was testifying on cross-examination, the following occurred:
“[Defense counsel]: Was Mr. Luong particular and careful about even family members taking the children off?
“(Interpreter translating.)
“The interpreter: Can you repeat the question? Actually I don’t quite understand your question myself.”
(R. 1000,) Later, during the same cross-examination, the following occurred:
“[Phan]: I heard that word [dust of life], but I didn’t understand it because I live in the countryside with my grandparents.
“[Defense counsel]: Did she know that was referring to a mixed-race child?
“The interpreter: I don’t agree with that. •
“Judge, would you allow me to explain the word? Misapply.
“The Court: You will have to translate what the witness says as opposed to yourself.”
(R. 1006-07.)
In any further proceedings, we urge the circuit court to fully comply with the procedures adopted by AOC when dealing with foreign-language-speaking interpreters.
VI.
Luong further argues that the circuit court erred in allowing his statements to police to be admitted into evidence because, he says, he did not voluntarily waive his Miranda warnings,[14] his statements were not voluntary, and law-enforcement officers failed to clarify his request for a Vietnamese attorney.
When reviewing a trial court’s ruling on a motion to suppress, we use the standard articulated by the Alabama Supreme Court in McLeod v. State, 718 So.2d 727 (Ala.1998):
“For a confession, or an inculpatory statement, to be admissible, the State must prove by a preponderance of the evidence that it wás voluntary. Ex parte Singleton, 465 So.2d 443, 445 (Ala.1985). The initial determination is made by the trial court. Singleton, 465 So.2d *134 at 445. The trial court’s determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala.Crim.App.1984)....
“The Fifth Amendment to the Constitution of the United States provides in pertinent part: ‘No person ... shall be compelled in any criminal case to be a witness against himself....’ Similarly, § 6 of the Alabama Constitution of 1901 provides that ‘in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself.’ These constitutional guarantees ensure that no involuntary confession, or other inculpatory statement, is admissible to convict the accused of a criminal offense. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (1968).
“It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe, 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, ‘if his will has been overborne’ by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added).
“The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the ‘totality of the circumstances.’ Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant’s will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990) (stating that, to admit a confession, a court must determine that the defendant’s will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is “whether the defendant’s will was overborne at the time he confessed’Xempha-sis added).”
718 So.2d at 729 (footnote omitted).
Before trial, Luong moved to suppress his statements, and an extensive hearing was held on the motion at which several police officers testified. (C.R. 204; R. 186-275.) During the suppression hearing, Jason Edwards, a corporal with the Bayou La Batre police department, testified that at around 8:00 p.m. in the evening of January 7, 2008, he was dispatched to Luong’s house in response to a missing person’s call. Cpl. Edwards testified that when he arrived at the house, Luong was standing in the front yard, and Luong advised him that his four children were missing. Luong told Cpl. Edwards that he had given the children to a women named Kim. Later that night, at approximately 10:00 p.m., Cpl. Edwards said that Luong came to the police station. Cpl. Edwards *135 testified that at that time Cpl. Shelly advised Luong of his Miranda rights and that Luong signed a waiver-of-rights form.
Cliff Adams, a detective with the Bayou La Batre police department, testified that he interviewed Luong on the evening of January 7, 2008, after Luong had been advised of his Miranda rights. He said that Luong told police that his children were with a women named Kim. Det. Adams further testified that Luong did not appear to be under the influence of anything, that he did not promise Luong anything in exchange for a statement, that he could understand Luong’s English, and that Luong appeared to understand the police officers based on his responses to questions.
Scott Riva, a former Detective with the Bayou La Batre police department, testified that he first came into contact with Luong on the evening of January 7, 2008, when Luong came to the police station. Riva said that Luong came to the police station again on the morning of January 8, 2008, with his wife. At that time Riva asked Luong if he would take police to the exact location where he gave the children to Kim.
Darryl Wilson, a captain with the Bayou La Batre police department, testified that he arrived at the police station on January 8, 2008, at approximately 11:00 a.m. and Luong was at the police station. Cpt. Wilson testified that he greeted Luong, that he went to get a Miranda form, that he read Luong his rights, and that Luong signed a waiver-of-rights form. Luong told him that he could understand and speak English, that he had been in the United States since 1984 when he was 14 years old, and that he understood Cpt. Wilson “very well.” (R. 236.) Cpt. Wilson further testified that he did not promise Luong anything and that Luong was not threatened. At this time, Luong told Cpt. Wilson that he had given the children to a woman named Kim. Cpt. Wilson told Luong that he did not believe him and that Luong had allowed a girlfriend to take the children, that he had sold the children for crack cocaine, or that he had killed the children. Cpt. Wilson said that Luong dropped his head, and he asked Luong to take him to the children. Cpt. Wilson testified that he and Chief Joyner drove with Luong to Biloxi, where Luong said he had given the children to Kim. They all returned to the police station after failing to find a woman named Kim, and when Cpt. Wilson was putting Luong into a holding cell Luong asked him if he could speak with his wife. Cpt. Wilson said that Luong and his wife had a conversation for about four minutes mostly in Vietnamese and that at the end of that time Kieu dropped to the floor and started to cry hysterically. Kieu told Wilson that Luong had said to her that he had killed the children. Cpt. Wilson said that he asked Luong where the children were and that Luong said he would take police to them. Cpt. Wilson and Luong got into a patrol car and Cpt. Wilson asked Luong where he needed to drive. Luong told Cpt. Wilson to go to the Dauphin Island Bridge. Cpt. Wilson then testified:
“And not fathoming what he said, I turned around and said: Do you mean to tell me that you threw your four children off the top of the Dauphin Island Bridge? And he said yes.
“And, there again, I asked him a second time: You killed your children by throwing them off the top of the Dauphin Island Bridge? And again he responded: Yes. And I asked him why. I said: Why? And he said: Ask my family; they know why.”
(R. 252.)
A.
Luong first argues that the waiver of his Miranda rights was not knowing and vol *136 untary because, he says, he spoke limited English, he had a limited education, and he suffered from a mental illness.
“Miranda itself indicated that no talismanic incantation was required to satisfy its strictures.” California v. Prysock, 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981). “[A] lack of fluency in English does not automatically preclude a defendant from executing a knowing and voluntary .waiver of rights in that language ,,” United, States v. Ocasio, 80 Fed.Appx. 127, 129 (2nd Cir.2003).[15] “While a ‘limited ability to understand English may render a waiver of rights defective,’ this alone is not dispositive.” United States v. Monreal, 602 F.Supp.2d 719, 722 (E.D.Va.2008).
“Language difficulties encountered by a defendant are considered in determining if there has been a valid waiver. See, e.g., United States v. Hernandez, 913 F.2d 1506, 1509-1510 (10th Cir.1990); United States v. Boon San Chong, 829 F.2d 1572, 1574-1575 (11th Cir.1987); Perri v. Director, Department of Corrections, State of Illinois, 817 F.2d 448, 452-453 (7th Cir.1987); United States v. Bernard S., 795 F.2d 749, 751-753 (9th Cir.1986); United States v. Short, 790 F.2d 464, 469 (6th Cir.1986)....
“... [T]he fact that the Defendant may not have understood all of the consequences of his waiver and was unfamiliar with the American legal system is insufficient to invalidate the waiver so long as the,proof shows, as it did here, the requisite level of comprehension (i.e,, that he need not talk, that he could have a lawyer, and that any statements can be . used against him). Colorado v. Spring, 479 U.S. 564, 573-576, 107 S.Ct. 851, 857-858, 93 L.Ed.2d 954 (1987); United States v. Yunis, 859 F.2d 953, 964-966 (D.C.Cir.1988).”
State v. Van Tran, 864 S.W.2d 465, 473 (Tenn.1993).
“Even though his proficiency in the English language may have been limited, it did not prevent him from making a knowing and intelligent waiver of his constitutional rights. [The defendant’s] native tongue is Spanish. Nonetheless, the record, and in particular the transcript of the recorded interview, reveals that, although he spoke in broken English with an accent and occasionally lapsed into Spanish, his command of English was sufficient for him to have understood the Miranda warnings given to him.” '
Campaneria v. Reid, 891 F.2d 1014, 1020 (2d Cir.1989).
When determining whether a defendant whose English is his or her second language had voluntarily waived his or her Miranda rights, we consider the following:
“(I) [W]hether the defendant, indicated in the affirmative when asked if he un *137 derstood his rights; (ii) whether the defendant indicated he understood English; (iii) the length of defendant’s residency within the United States; and (iv) defendant’s previous encounters with the criminal justice system.”
United States v. Moreno, 122 F.Supp.2d 679, 681 (E.D.Va.2000). See also Kimberly J. Winbush, J.D., Annot., Suppression of Statements Made During Police Interview of Norir-English-Speaking Defendant, 49 A.L.R.6th 843 (2009).
Concerning the impact of a defendant’s mental state on the voluntariness'of á confession, this Court has stated:
“Having a low IQ will not render a waiver ineffective unless the individual’s IQ is so low that the person attempting to waive his rights absolutely cannot understand his Miranda rights. Arnold v. State, 448 So.2d 489 (Ala.Crim.App.1984).
“ ‘We have often held that “the fact that a defendant may suffer from a mental impairment or low intelligence will not, without other evidence, render a confession involuntary.” See Colorado v. Connelly, 479 U.S. 157, 163-65, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986); Baker v. State, 599 So.2d 60, 63 (Ala.Cr.App.1991), State v. Austin, [596 So.2d 598 (Ala.Cr.App.1991)], Holladay v. State, 549 So.2d 122 (Ala.Cr.App.1988), aff'd, 549 So.2d 135 (Ala.1989), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).’
“Youngblood v. State, 656 So.2d 385, 387 (Ala.Cr.App.1993).
“ ‘[A] defendant’s mental impairment, even if it exists, is merely one factor affecting the validity of his waiver of rights and the voluntariness of his confession. See generally Annot., 8 A.L.R.4th 16 (1981). “While an accused’s. intelligence and literacy are important factors to be considered in determining whether he intelligently and voluntarily waived his constitutional-rights and made a confession, weak intellect or illiteracy alone will not render a confession inadmissible.” Hobbs v. State, 401 So.2d 276, 282 (Ala.Cr.App.1981).’
“Whittle v. State, 518 So.2d 793, 796-97 (Ala.Cr.App.1987)”
Dobyne v. State, 672 So.2d 1319, 1337 (Ala.Crim.App.1994).
The record indicates that Luong .came, -to the United States when he 14 years old, that he was 37 years old at the time of the murders, that he attended high school in the United States through the 11th grade, that he had held various jobs, and that he had had prior experiences with law enforcement. Luong signed a Miranda waiver-of-rights form. Also, a mental evaluation of Luong had been conducted before trial. Nothing in the record suggests that Ling’s mental capacity rendered his statement involuntary or that Luong was incapable of waiving his rights after they were read to him in English.
B.
Luong next argues that his confession was not voluntary because, he says, his will was overborne by the police officers.
“The fundamental requirements for voluntariness of confessions are that the court must conclude, in order to find a defendant’s confession voluntary, that he made an independent and informed choice of his own free will, that he possessed the capacity to do so, and that his will was not overborne by pressures and circumstances swirling around him.... The factual inquiry centers on the conduct of the law enforcement officials in creating pressure and the suspect’s capacity to resist that pressure. Mincey *138 v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); Martin v. Wainwriglit, 770 F.2d 918 (11th Cir.1985); Jurek v. Estelle, [623 F.2d 929 (5th Cir.1980) ]. The defendant’s personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining his susceptibility to police pressures. Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957); Stein v. New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953); Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); Martin v. Wainwright[, 770 F.2d 918 (11th Cir.1985).]”
Jackson v. State, 562 So.2d 1373, 1380-81 (Ala.Crim.App.1990).
There is absolutely no evidence that the police placed undue pressure on Luong to confess or that his will was overborne.
C.
Luong finally argues that the circuit court erred in allowing his last statement to be received into evidence because, he says, questioning did not cease when he asked for a Vietnamese attorney.
In Ling's last statement made on January 9, 2008, Luong again said that he had given the children to a person named Kim. This statement was substantially similar to a previous statement that was offered and admitted at trial. However, at the beginning of this statement,' Cpl. Wilson asks Luong if he understood that he had the right to an attorney. Luong then stated: “Vietnamese-. They will give me Vietnamese attorney?” (Supple.R. 160.)
“Invocation of the Miranda right to counsel ‘requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.’ McNeil v. Wisconsin, 501 U.S., [171] at 17 [ (1991) ]. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning. See ibid. (‘[T]he likelihood that a suspect would wish counsel to be present is not the test for applicability of Edwards ’); Edwards v. Arizona, 451 U.S. [477] 485 [ (1981) ] (impermissible for authorities ‘to rein-terrogate an accused in custody if he has clearly asserted his right to counsel’) (emphasis added).
“Rather, the suspect must unambiguously request counsel. As we have observed, ‘a statement either is such an assertion of the right to counsel or it is not. Smith v. Illinois, 469 U.S., [91] at 97-98 [ (1984) ] ... Although a suspect need not ‘speak with the discrimination of an Oxford don,’ post, at 476 (Souter, J., concurring in judgment), he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the suspect. See Moran v. Burbine, 475 U.S. 412, 433, n. 4 [ (1986) ] (‘[T]he interrogation must cease until an attorney is present only [i]f the individual states that he wants an attorney’) (citations and internal quotation marks omitted).”
Davis v. United States, 512 U.S. 452, 458-61, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).
It is unnecessary for this Court to determine whether Luong made an un *139 equivocal request for counsel because any admission of this statement was harmless given that the contents of the statement were substantially similar to a previous statement that was lawfully admitted. See Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

Conclusion

For the reasons stated in Parts I, II, and IV of this opinion, this Court has no alternative but to reverse Luong’s convictions for capital murder and his sentence of death and to remand this case to the circuit court for further proceedings not inconsistent with this opinion.
REVERSED AND REMANDED.
WELCH, KELLUM, BURKE, and JOINER, JJ., concur.
WINDOM, P.J., recuses herself.

. There was testimony that Kieu was pregnant with Ryan Phan when she met Luong and that Luong was the biological father of Danny, Lindsey, and Hannah.

. This hearing was held on June 7, 2008, and a transcript of it is contained in Volume 14 of the record.

. A plea of guilty to capital murder requires that a jury be empaneled to determine a defendant's guilt beyond a reasonable doubt. Section 13A-5-42, Ala.Code 1975, provides:
"A defendant who is indicted for a capital offense may ple'ad guilty to it, but the state must in any event prove the defendant’s guilt of the capital offense beyond a reasonable doubt to a jury, The guilty plea may be considered in determining whether the state has met that burden of proof. The guilty plea shall have the effect of waiving all non-jurisdictional defects in the proceeding resulting in the conviction except the sufficiency of the evidence. A defendant convicted of a capital offense after pleading guilty to it shall be sentenced according to the provisions of Section 13A-5-43(d).”

. Question number 51 read:
"Did you read or hear anything concerning this case? Before coming to .the courthouse? _ Yes _ No _ n/a; Since coming to the courthouse? _Yes_No _n/a. If yes, what did your hear? _”

. One juror who completed the questionnaire did not return after the questionnaire had been completed because she had a family emergency. (R. 413.) A second juror who had completed the questionnaire was excused after she became ill during the voir dire process. (R. 581.) Thus, we have considered the jurors questionnaires of the 154 jurors who were subject to the striking process.

. An appellate court may take judicial notice of the population of a given area. See State v. Temple, 789 So.2d 639, 644 (La.Ct.App.2001); State v. Cobb, 898 S.W.2d 124, 127 (Mo.Ct.App.1995).

. On April 16, 2007, 33 people, including the gunmen, were killed on the campus of Virginia Tech. On September 11, 2001, commercial airlines hijacked by terrorists crashed into the World .Trade Center in New. York City, the Pentagon, and a field in Pennsylvania, resulting in the loss of thousands of lives.

. Various parts of the record indicate that Luong came to the United States when he was 14 years old and other portions of the record indicate that he was 13 years old when he immigrated.

. This Rule was amended effective January 1, 1991, to require a complete recordation of the voir dire examination in all capital cases.

. Rule 18.2(b), Ala. R.Crim. P., provides that juror questionnaires included with a record on appeal aré "aváilable for inspection only by the court and the parties to the appeal.”

. We question the accuracy of the body weights, given that Cpt. Wilson said that he used the weights of the children at the time of the autopsies, which could have differed significantly from their weights at the time of death.

. This interpreter was also present at trial but the record reflects that Luong rarely used this interpreter during the circuit court proceedings.

. This section provides, in part:
"When a Certified interpreter has not been appointed, the court should give instructions to the otherwise qualified interpreter, either orally or in writing, that substantially conform to the following:
"1. Do not discuss the pending proceedings with a party or witness, outside of professional employment in the same case.
“2. Do not disclose communications between counsel and client.
"3. Do not attempt to give legal advice to a party or witness. Refer legal questions to the attorney or to the court.
“4. Inform the court if you are unable to interpret a word, expression, special terminology, or dialect, or have doubts about your linguistic expertise or ability to perform adequately in a particular case.
“5. Interpret all words, including slang, vulgarisms, and epithets, to convey the intended meaning.
[[Image here]]
"7. Direct all inquires or problems to the court and not to the witness or counsel. If necessary, you may request permission to approach the bench with counsel to discuss a problem....”

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. “Although the llth Circuit does not mandate reading Miranda in a language other than English, its precedent clearly indicates reading Miranda in a language the suspect understands would allow for a knowing waiver of suspect’s Miranda Rights. See, e.g., United States v. Bernal-Benitez, 594 F.3d 1303, 1316-19 (11th Cir.2010) (finding that both defendants knowingly waived Miranda rights when they were read to them in Spanish by an FBI agent fluent in Spanish); United States v. Beale, 921 F.2d 1412, 1434-35 (11th Cir.1991) (holding that a defendant who did not speak English, nor could read Spanish, could still knowingly waive his rights when Miranda Warning was read to him in Spanish); United States v. Boon San Chong, 829 F.2d 1572, 1574 (11th Cir.1987) (holding Miranda waiver valid where defendant was advised of his rights in his native language and English and claimed to understand).”
United State v. Domingo, (No. 2:09-cr-42-FtM-36SOC, October 28, 2010) (not reported in F.Supp.2d).