PARKER, Justice
(dissenting).
I respectfully dissent from the main opinion. I write specifically to address Parts I and II of that opinion.
This Court has a duty to protect the Constitution and to uphold is provisions.
“The right of the accused to a fair and impartial trial, or to a fair trial before an *162 impartial jury, is a constitutional right. Regardless of all other considerations, it affirmatively appears from the record before us in its entirety that the accused did not have a trial by an impartial jury. We cannot, if we were so disposed, ignore the solemn duty placed upon this court by our organic law. The Constitution is the supreme law of this jurisdiction, and we are enjoined to enforce and to uphold its provisions. No higher obligation could be placed upon us. Fidelity to our oaths demands that we give effect to the constitutional guaranty that every person accused of crime has a right to a trial before an impartial jury. We are convinced that the accused has been denied his constitutional right....
“In the case of Johnson v. Craft et al., 205 Ala. 386, 87 So. 375 [ (1921) ], it was said:
“‘The Constitution’s control is absolute wherever and to whatever its provisions apply; and every officer, executive, legislative, and judicial, is bound by oath (section 279) to support the Constitution, to vindicate and uphold its mandates, and to observe and enforce its inhibitions without regard to extrinsic circumstances. It commits to nobody, officer, or agent any authority or power whatever to change or modify or suspend the effect or operation of its mandates or its prohibitions.’ ”
Martin v. State, 22 Ala.App. 154, 158, 113 So. 602, 606 (1926) (emphasis added), reversed on other grounds, 216 Ala. 160, 113 So. 602 (1926). These principles compel me to dissent from the main opinion for the specific reasons set forth below.
I.
I dissent from the conclusion in the main opinion that “the trial court did not exceed the scope of its discretion in refusing to find presumed prejudice against [Lam] Luong....” 199 So.3d at 150.
Under the Sixth Amendment to the United States Constitution, every criminal defendant has a right to an impartial jury. One of the ways a criminal defendant’s right to an impartial jury can be threatened is by media coverage. In certain cases, when extensive and inflammatory media coverage has saturated the community, a presumption may arise that any potential jurors are prejudiced against the defendant. In order to ensure that a criminal defendant’s Sixth Amendment right to an impartial jury is protected, the Supreme Court of the United States has developed a four-factor test to determine whether a presumption of juror prejudice exists in light of the specific facts of a case. The four factors are: “(1) the size and characteristics of the community where the crimes occurred; (2) the general content of the media coverage; (3) the timing of the media coverage in relation to the trial; and (4) the media interference with the trial or the verdict.” Luong v. State, 199 So.3d 98, 112 (Ala.Crim.App.2013) (summarizing the four factors set forth in Skilling v. United States, 561 U.S. 358, 381-83, 130 S.Ct. 2896, 2915-16, 177 L.Ed.2d 619 (2010)).
Of critical importance in the present case is the second factor: the content of the media coverage. Generally, the presumed-prejudice principle is “rarely applicable” and is “reserved for extreme situations.” Coleman v. Kemp, 778 F.2d 1487, 1537 (11th Cir.1985). However, the Supreme Court of the United States has held that when a confession is accompanied by media coverage of other prejudicial or inflammatory information, prejudice is presumed. Rideau v. Louisiana, 373 U.S. 723, 733, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). The media coverage in this case, *163 the details of which are set forth in the Court of Criminal Appeals’ opinion in Luong and discussed more thoroughly below, warrants a presumption that the jurors, chosen from citizens in Mobile County, were prejudiced against Luong. “The theory of [the trial] system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.” Patterson v. Colorado ex rel. Attorney General of Colorado, 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879 (1907). Accordingly, a trial court may, upon motion by the defense or the prosecution, transfer a case to another county or take any other action designed to ensure that a fair trial may be had if there exists in the county in which the prosecution is pending such prejudice that a fair trial cannot be had there. See Skilling, 561 U.S. at 378, 130 S.Ct. at 2913 (“The Constitution’s place-of-trial prescriptions ... do not impede transfer of the proceeding to a different district at the defendant’s request if extraordinary local prejudice will prevent a fair trial — a ‘basic requirement of due process.’ ”).
The prerequisite for obtaining a change of venue on the ground of prejudice is that the prejudice is such that it will prevent a fair and impartial trial in the current venue. This prejudice can take several forms, but the ground most commonly advanced for a change of venue is that adverse pretrial publicity precludes the selection of an unbiased jury. 4 Wayne R. LaFave et al., Criminal Procedure § 16.3(b), 806 (3d ed.2007). In other words, when pretrial publicity creates prejudice, a change of venue may be appropriate.
Furthermore, prejudice may be presumed where “ ‘pretrial publicity is so pervasive and prejudicial that [a court] cannot expect to find an unbiased jury pool in the community.’ ” House v. Hatch, 521 F.3d 1010, 1023-24 (10th Cir.2008) (quoting Goss v. Nelson, 439 F.3d 621, 628 (10th Cir.2006)); see also United States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir.1990) (stating that court must consider whether prejudicial inflammatory publicity regarding the defendant’s case so saturated the community as to render it virtually impossible to obtain an impartial jury there). To justify a presumption of prejudice under this standard, the publicity must be both extensive and sensational in nature. Angiulo, 897 F.2d at 1181.
The rationale underlying the principle of presumed prejudice is that defendants and judges “simply cannot rely on ‘“jurors’ claims that they can be impartial.” ’ ” United States v. McVeigh, 153 F.3d 1166, 1182 (10th Cir.1998) (quoting Mu’Min v. Virginia, 500 U.S. 415, 429, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991), quoting in turn Patton v. Yount, 467 U.S. 1025, 1031, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) (“[Adverse pretrial publicity can create süch á presumption of prejudice in a community that the jurors’ claims that they can be impartial should not be believed.”)); Hayes v. Ayers, 632 F.3d 500, 511 (9th Cir.2011) (“We may give ‘little weight’ to a prospective juror’s assurances of impartiality ‘where the general atmosphere in the community or courtroom is sufficiently inflammatory.’ ” (citations omitted)); United States v. Abello-Silva, 948 F.2d 1168, 1176-77 (10th Cir.1991) (“In rare cases, the community is so predisposed that prejudice can be presumed, and venue must be transferred as a matter of law.”); 6 La-Fave, Criminal Procedure § 23.2(a), 264 (“[Prejudicial publicity may be so inflammatory and so pervasive that the voir dire simply cannot be trusted to fully reveal the likely prejudice among prospective jurors.”).
*164 As mentioned above, the principie of presumed prejudice is rarely applicable and is reserved for extreme situations. See Hayes, 632 F.3d at 508; United States v. Campa, 459 F.3d 1121, 1143 (11th Cir.2006); accord Skilling, 561 U.S. at 381, 130 S.Ct. at 2915 (“A presumption of prejudice, our decisions indicate, attends only the extreme case.”). The defendant’s burden in proving presumed prejudice is, consequently, extremely high. McVeigh, 153 F.3d at 1182. Thus, it has been said that to establish presumptive prejudice, the defendant must show that “an irrepressibly hostile attitude pervade[s] the community” and that the publicity “dictates the community’s opinion as to guilt or innocence.” Abello-Silva, 948 F.2d at 1176, It likewise has been said that prejudice cannot be presumed unless the trial atmosphere has been “‘utterly corrupted by press coverage.’ ” Campa, 459 F.3d at 1144 (quoting Dobbert v. Florida, 432 U.S. 282, 303, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977)). The reviewing court “must find that the publicity in essence displaced the judicial process, thereby denying the defendant his constitutional right to a fair trial.” McVeigh, 153 F.3d at 1181. As stated above, the Supreme Court of the United States has considered four factors in determining whether a trial court should presume prejudice from media coverage: (1) the size and characteristics of the community in which the crime or crimes occurred; (2) whether the media coverage contained a confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight, i.e., the general content of the media; (3) the temporal proximity between the media coverage and the defendant’s trial; and (4) media interference with the jury’s verdict. Skilling, 561 U.S. at 377-83, 130 S.Ct. at 2913-16.
I agree with the Court of Criminal Appeals’ analysis of each of the above factors. I find the Court of Criminal Appeals’ discussion of the second prong to be particularly persuasive in this case.
In Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), the seminal case concerning presumed prejudice, the defendant’s videotaped confession to law enforcement was broadcast on numerous occasions over a local television station to a relatively small community; the Supreme Court of the United States concluded that such media coverage resulted in a “kangaroo court” that derailed due process and quashed any hope of a fair trial in that location, 373 U.S. at 726. The Supreme Court held that “the spectacle of [the defendant] personally confessing in detail to the crimes with which he was later to be charged,” to the tens of thousands of people who saw and heard it, “in a very real sense was [the. defendant’s] trial — at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.” Rideau, 373 U.S. at 726, The Supreme Court reached this conclusion “without pausing to examine a particularized transcript of the voir dire examination of the members of the jury.” 373 U.S. at 727. The Supreme Court held that prejudice was presumed.
In Skilling, the Supreme Court of the United States noted that, although the news stories regarding the defendant and the crime were not kind by any means, they did not contain “a confession or other blatantly prejudicial information” of the type readers or viewers could not reasonably be expected to ignore. 561 U.S. at 382, 130 S.Ct. at 2916. Comparing the content of the media coverage in Skilling to that of Rideau, supra,' the Supreme Court found that the content of the media coverage did not warrant a presumption of *165 prejudice. Skilling, 561 U.S. at 383, 130 S.Ct. at 2916. The Supreme Court noted in Rideau that “[w]hat the people ... saw on their television sets was [the defendant], in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff.” Rideau, 373 U.S. at 725. The Supreme Court also noted in Rideau that “[f]or anyone who has ever watched television the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense was [the defendant’s] trial — at which he pleaded guilty to murder.” 373 U.S. at 726. In contrast, the Supreme Court noted in Skilling that although Rideau’s “dramatically staged admission of guilt ... was likely imprinted indelibly in the mind of anyone who watched it,” the pretrial publicity involving Skilling, in comparison, was less memorable, and thus less prejudicial; Skilling did not involve any confession, much less a blatantly prejudicial smoking-gun variety confession, that could invite prejudgment opinions throughout the community regarding his culpability. Skilling, 561 U.S. at 383, 130 S.Ct. at 2916. The United States District Court for the Southern District of Texas denied Skilling’s change-of-venue motion, despite “isolated incidents' of intemperate commentary,” because the media coverage “ha[d] [mostly] been objective and unemotional,” and the facts of the case were “neither heinous nor'sensational.” 561 U.S. at 370, 130 S.Ct. at 2908. The court concluded that pretrial publicity concerning the case did not warrant a presumption that the defendant would be unable to obtain a fair trial in that venue. 561 U.S. at 370-71, 130 S.Ct. at 2909.
In Ex parte Fowler, 574 So.2d 745 (1990), this Court also declined to presume prejudice when the media coverage gave only “factual and objective accounts of the events surrounding the petitioner’s case.” 574 So.2d at 748. The defendant in Fowler attempted to show that there had been extensive publicity surrounding the case in Fayette County and that some of that publicity had spilled over into Lamar County, the county the trial judge, upon a motion for a change of venue, deemed appropriate in which to try the case. Fowler, 574 So.2d at 749. The defendant introduced the results of a survey of 200 potential jurors in Lamar County. A majority of those who participated in the survey stated that they had knowledge of the case. Those who stated that they were aware of the case also stated that they had acquired their knowledge largely by reading articles appearing in newspapers published in Fayette, Lamar, and Tuscaloosa Counties, by listening to the radio, and by talking with friends and relatives. Of those who participated in the survey, 46% stated that, based on what they had read or. heard about .the case, they personally believed that the defendant was not justified in killing her husband. After carefully reviewing the numerous newspaper articles and the transcripts of radio broadcasts that were contained in the record, this Court concluded that none of the media coverage was inherently prejudicial or tended to inflame the community to rally against the defendant'. To the contrary, the media coverage contained only factual and objective accounts of the events surrounding the defendant’s case and not necessarily anything that would be unfairly prejudicial or inflammatory. Id.
In this case, Lam Luong confessed to throwing his four children, one at a time, off the Dauphin Island Bridge. The State emphasizes, however, that Duong’s confession, unlike the defendant’s confession in Rideau, was not broadcast. State’s brief, *166 at p. 36. However, Luong’s guilty plea was broadcast. State’s brief, at p. 36.
The Supreme Court of the United States in Skilling hinted that a guilty plea, by itself, whether treated the same as a confession or as mere “blatantly prejudicial information,” might not be enough to warrant the presumption of prejudice when the guilty plea is made by a codefendant; it, however, did not address the effect of broadcasting a defendant’s guilty plea, as occurred in this case. Skilling, 561 U.S. at 385, 130 S.Ct. at 2917 (“Although publicity about a codefendant’s guilty plea calls for inquiry to guard against actual prejudice, it does not ordinarily — and, we are satisfied, it did not here — warrant an automatic presumption of prejudice.”).
Regardless, because the media content consisted of other prejudicial information, not only a confession or a guilty plea, such as “Luong’s prior criminal history, ... Luong’s desire to plead guilty, Luong’s decision to withdraw his guilty plea, the community’s outrage over the death of the four children, and what the community believed should be Luong’s punishment,” Luong, 199 So.3d at 121, it is not necessary to determine whether a confession alone has any bearing upon the presumption-of-prejudice analysis and whether a guilty plea is treated as a confession under Skilling.
The Court of Criminal Appeals detailed the extensive media coverage in Luong, as follows:
“Most of the articles cited above appeared on the front page of the [Mobile] Press-Register and were often accompanied by photographs of the four children, photographs of the recovery efforts, and photographs of individuals mourning the loss of the four victims. It was reported on numerous occasions that Luong had been described by the local community as a crack addict, that the motive for the murders was revenge, that Luong had a criminal history, that Luong had been in trouble with the law in Georgia and Mississippi, that Luong had been arrested in Georgia for possessing crack cocaine, that Luong had pleaded guilty in 1997 to possessing cocaine in the State of Mississippi, that Luong had had another drug charge in 2000 but that charge was dropped, that Luong’s drug problem and his behavior were getting worse, and that Luong had said that he wanted his case to be more famous than Virginia Tech or September 11, 2001.
“There were articles describing the impact of the crime on the community and the community’s efforts to come to terms with the ramifications of Luong’s actions. There was extensive publicity concerning the community’s involvement in the case and the recovery efforts the community had undertaken to find the bodies of the four children. At one point over 150 people, mostly volunteers, helped with the recovery efforts, and the newspaper asked all owners of property near the water to walk their properties. A local cemetery donated the plots for the children to be buried and set aside a plot for the children’s mother. A local school raised money for the mother. A permanent memorial was erected at Maritime Park in Bayou La Batre to honor the children. The community was invited to the graveside service for the children, the family of the victims hosted an appreciation dinner for the volunteers who had searched for the children’s bodies, and a moment of silence was observed at a Mardi Gras parade to honor the children. Individuals indicated how consumed the Mobile community had become with the tragedy and the anger and outrage that the community felt toward Luong.
*167 “Luong’s case also received extensive local television coverage. Bob Cashen, news director for local FOX affiliate WALA-TV, Channel 10, stated that his station aired 143 news segments related to the murders. Christian Stapleton, the custodian of records for local CBS affiliate WKRG, Channel 5, stated that 442 stories had been aired concerning the case from January 2008 through January 2009. Wes Finley, news director for local NBC affiliate WPMI, Channel .15, furnished a list of 93 stories that had been aired about the case. WKRG also hosted an online forum concerning the murders entitled ‘Children Thrown from the Bridge.’ One topic in this forum entitled ‘How Should the Baby Killer be Dealt With’ was viewed over 16,000 times.”
Luong, 199 So.3d at 119 (footnote and reference to record omitted).
Further, in support of his change-of-venue motion, Luong presented the results of a telephone poll that had been conducted by Dr. Verne Kennedy, the president of Market Research Insight, Inc. Dr. Kennedy’s poll, conducted in January 2009 of 350 people in the Mobile area, revealed that 84% of those polled had heard about the case, that 44% had heard a great deal about the case, that 71% had a personal opinion that Luong was guilty, and that 75% thought that other people viewed Luong as guilty.
The media coverage in this ease was extensive and sensational; I agree with the Court of Criminal Appeals concerning this issue and its conclusion that “Luong’s case represents one of those rare instances where prejudice must be presumed.” Luong, 199 So.3d at 122. Therefore, I respectfully dissent from the conclusion in the main opinion that “the trial court did not exceed the scope of its discretion in refusing to find presumed prejudice against Luong....” 199 So.3d at 150.
II.
I also dissent from the conclusion in the main opinion that “the Court of Criminal Appeals erred in holding that individual voir dire was mandated.... ” 199 So.3d at 157.
Based on my conclusion that Luong put forth evidence of pervasive prejudice against him based on the extensive and sensational media coverage, the burden then shifted to the State to rebut that presumption. Campa, 459 F.3d at 1143. In Campa, the United States Court of Appeals for the Eleventh Circuit held that “the government can rebut any presumption of juror prejudice by demonstrating that the district court’s careful and thorough voir dire, as well as- its use of prophylactic measures to insulate the jury from outside influences, ensured that the defendant received a fair trial by an impartial jury.” ' 459 F.3d at 1143. Individual voir dire was necessary in order to ensure that the veniremembers selected to serve on Luong’s jury held no prejudice against him.
I note that, in Aabama, voir dire is conducted under the discretion of the trial court-and that, ‘“[ejven in capital cases, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination— ’” Browning v. State, 549 So.2d 548, 552 (Ala.Crim.App.1989) (quoting Hallford v. State, 548 So.2d 526 (Ala.Crim.App.1988)). Additionally, according to the United States Supreme Court, “no hard-and-fast formula dictates the necessary depth or breadth of voir dire.” Skill-ing, 561 U.S. at 386, 130 S.Ct. at 2917.
However, “individual questioning may be necessary under some circumstances to ensure that all [juror] prejudice has been *168 exposed.” Haney v. State, 603 So.2d 368, 402 (Ala.Crim.App.1991). Also, “questions on voir dire must be sufficient to identify prospective jurors who hold views that would prevent or substantially impair them from performing the duties required of jurors.” Jackson v. Houk, 687 F.3d 723, 735 (6th Cir.2012); see also 6 LaFave, Criminal Procedure § 23.2(f), 278 (“Yet another way to overcome the prejudicial impact of pretrial publicity is by a voir dire that identifies those prospective jurors influenced by the publicity and a challenge procedure that eliminates all persons in that group who actually have been biased by the publicity”).
In the present case, in light of the voluminous evidence put forth by Luong establishing a presumption of prejudice based on the extensive and sensational media coverage, individual voir dire was required to ensure that Luong receive a fair trial by an impartial jury. In support of my conclusion, a comparison of two cases decided by the United States Court of Appeals for the Eleventh Circuit, Campa, supra, and Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985), is helpful.
In Campa, a case concerning whether presumed prejudice based on extensive and inflammatory media coverage existed, the Eleventh Circuit Court of Appeals stated: . .
“Once the defendant puts forth evidence of the pervasive prejudice against him, the government can rebut any presumption of juror prejudice by demonstrating that the district court’s careful and thorough voir dire, as well as its use of prophylactic measure to insulate the jury from outside influences, ensured that the defendant received a fair trial by an impartial jury.”
459 F.3d at 1143. The Eleventh Circuit then examined -the. trial court’s voir dire of the veniremembers and stated:
“The voir dire in this case was a model voir dire for a high profile case. The court conducted a meticulous two-phase voir dire stretching over seven days. In contrast to the generalized, pre-fabricat-ed, and sometimes leading questions of [a] survey [submitted by the defendant] were the detailed and neutral voir dire questions that the court carefully crafted with the parties’ assistance. In the first phase of voir dire, the court screened 168 prospective jurors for hardship and their ability to reach a verdict based solely on the evidence. In the second phase, the court extensively and individually questioned 82 prospective jurors outside the venire’s presence regarding sensitive subjects.... Phase two questioning revealed that most bf the prospective jurors, and all of the empaneled jurors, had been exposed to little or no media coverage of the case. Those who had been exposed to media coverage of the case vaguely recalled a ‘shootdown,’ but little else. Ultimately, the court struck 32 out of 168 potential jurors (19%) for Cuba-related animus [the defendant was Cuban], which was well within an acceptable range.”
459 F.3d at 1147 (footnotes omitted). The Eleventh Circuit concluded:
“In sum, the record in this case amply demonstrates that the district court took extraordinary measures to carefully select a fair and impartial jury. The court extensively and individually questioned the prospective jurors, repeatedly cautioned them not to read anything or talk to anyone about the case, insulated the jurors from media publicity, provided the defendants with extra peremptory challenges, struck 32 persons for cause, and struck all of the Cuban-Americans over the government’s Batson[ v. Kentucky, 476 U.S. 79 (1986),] objection.
*169 Under these circumstances, we will not disturb the district court’s broad discretion in assessing the jurors’ credibility and impartiality.”
459 F.3d at 1148.
In Coleman v. Kemp, the Eleventh Circuit stated that a presumption of juror prejudice as a result of media coverage could be rebutted by voir dire of the members of the jury. 778 F.2d at 1541 n. 25. In Coleman, the defendant was charged with murdering six individuals. 778 F.2d at 1488. Once charges were brought against the defendant, the defendant filed a motion for a change of venue, alleging that refusal to grant the motion would deprive him of his right to an impartial jury guaranteed by the Sixth Amendment; the trial court denied the defendant’s motion, and the defendant appealed. On appeal, the defendant argued that the “pretrial publicity and the community’s atmosphere were so prejudicial and inflammatory that the trial court’s refusal to grant the [defendant’s] motion for a change of venue deprived him of his rights guaranteed by the Sixth ... Amendment! ].” 778 F.2d at 1489. The Coleman court concluded that the defendant could not receive a fair trial before an impartial jury in that venue because of the presumption of prejudice that had arisen as a result of the inflammatory pretrial publicity that had saturated the community. 778 F.2d at 1537-38. The State argued that the transcript of the voir dire record setting forth the “examination of the members of the jury” could rebut any presumption of prejudice; the Coleman court agreed that there could be such a rebuttal. However, the Coleman court concluded that the voir dire examinations conducted by the trial judge were insufficient to rebut the presumption of prejudice for two reasons.
First,, the problem with the voir dire in Coleman was that the trial court in that case did not ask “questions which were calculated to elicit the disclosure of the existence of actual prejudice, the degree to which the jurors had been exposed to prejudicial publicity, and how such exposure had affected the jurors’ attitude towards the trial.” 778 F.2d at 1542. Instead, the trial court in that case conducted an insufficient voir dire by asking leading questions and inducing conclusory answers.
Second, the voir dire in Coleman was insufficient because the trial court examined prospective jurors in the presence of other prospective jurors who had not yet been examined. The Coleman court stated that preferable voir dire procedures would have followed the American Bar Association Guidelines, as follows:
“ ‘If there is a substantial possibility that individual jurors will, be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to, exposure shall take place outside the presence of other chosen and prospective jurors.’ ”
778 F.2d at 1542.
The voir dire in the present case is more similar to the voir dire conducted in Coleman than to the voir dire conducted in Campa. In the present case, the trial court failed to conduct a sufficient voir dire examination of each juror by failing to obtain enough information to evaluate the degree to which the jurors had been exposed to prejudicial publicity and how such exposure had affected the jurors’ attitudes toward the trial.- According to the Court of Criminal Appeals, the trial court conducted the voir dire in the following order:
“On March 9, 2009, the voir dire examination began, and 156 prospective jurors completed juror questionnaires related to Luong’s case. The questionnaire consisted of 11 pages. Question *170 number 51 specifically asked the jurors if they had read or heard about the case and the content of what they had read or heard.... Most of the jurors who indicated that they had heard or read about the case did not complete the question concerning the content of what they had heard or read.
“A review of the questionnaires indicated that of the 156 jurors who completed questionnaires, 139 of those jurors had heard about the case and only 15 had not heard about the case; 38 of the jurors who had heard about the case responded that they had heard or read that Luong either had confessed to the murders or had pleaded guilty to the murders.
“After the circuit court held that it was allowing individual voir dire, the following occurred:
“ ‘The Court: What I am going to do is I’m going to say: I want everybody to raise their hand if they have heard, read, or seen, or by word of mouth know anything about this case. Raise your hand. Don’t tell me what it is.
“ ‘We’re going to take them names. I’m going to have them identify who they are and then we will take them individually.’
“However, during voir dire examination the circuit court merely asked the following questions concerning pretrial publicity:
“‘The Court: Okay. I have told you that there has been media coverage from various media outlets about this case. And I want to see a show of hands as to who may remember seeing, reading or hearing anything about this case.
“ ‘(Response.)
“ ‘The Court: Okay. I Think a better question would be — please put your hands down.
“ ‘(Laughter.)
“‘The Court: Who among you have not heard, read or seen anything about this case?
“ ‘(Response.)
“‘The Court: Okay. Could you— Ma’am, could you stand and give us your name and your number?
“ ‘[S.EJ: [S.E.], number 62.
“ ‘The Court: Thank you, ma’am. You may be seated.
“ ‘Yes, sir?
“ ‘[L.M.]: [L.M.], number 63.
“ ‘The Court: Thank you very much. Okay
“ ‘Now, listen to this question very carefully. Would any of you, based on what you have read, seen, or heard, or remember, could you set those things aside and serve as a fair and impartial juror?
“ ‘In other words, is there any member of the jury who thinks because they have a recollection of this case, whether it be from radio, television, or newspaper, Internet, or any other source, that it would be impossible for you to put that aside, lay that aside and sit as a fair and impartial juror in this case and base your decision only on the evidence as you hear it is in this courtroom?
“ ‘Can any of you — or would any of you tell me it would be impossible for you to sit as a fair and impartial juror in this case?
“ ‘(Response.)
“‘The Court: I see a hand in the back. Could you please stand, sir, and just give us your name and number?
“ ‘[S.T.]: Mr. [S.T.], 141.
“‘The Court: [S.T.], you are telling me that regardless of what you have *171 heard, read or seen, you are telling me that you in no way could set that aside and sit as a juror?
“‘[S.T.]: No, sir.
“ ‘The Court: Thank you. Is it 144?
“‘[S.T.]: 141.
“‘The Court: All right. The rest of you are telling me that even though you may have heard, read or seen matters about this case, and you may have had some preconceived impression or opinion, based on what you have .heard, read or seen, that you could sit as a juror in this case, base your verdict only on the evidence as it comes from the witness stand and any evidence that may be introduced into evidence in the form of photographs or documents or something, and you could render a fair and impartial verdict by setting aside any of that and base your verdict on the evidence that you hear in this courtroom? You can do that.
“ ‘(Response.)
“ ‘The Court: If you can’t, other than [S.T.], please raise your hand.
“ ‘(No response.)’ ”
Luong, 199 So.3d at 105-07 (footnotes omitted). As the Court of Criminal Appeals noted, Luong objected to the trial court’s method of handling the issue of pretrial publicity and the court’s failure to allow individual voir dire. 199 So.3d at 107.
Further, the trial court in this case did not follow the American Bar Association Guideline, recommended in Coleman, that “‘the examination of each juror with respect to exposure shall take place outside the presence of other chosen and prospective jurors.’ ” Coleman, 778 F.2d at 1542. The trial court questioned the prospective jurors as a whole.
The voir dire conducted in this case is a mere shadow of the “model voir dire for a high profile case” employed by the federal district court in Campa. In the present case, all 12 jurors who served in Luong’s jury indicated in their juror questionnaires that they had heard that Luong had confessed or that he had pleaded guilty; however, none of those jurors were questioned individually. Instead, during the voir dire examination, the trial court merely asked the prospective jurors to raise their hands if they remembered seeing, reading, or hearing anything about the case. None of the jurors who served on Luong’s jury were questioned individually concerning their exposure to pretrial publicity. The trial court’s failure to conduct an individual voir dire of the jurors left unrebutted the presumption that the jurors were prejudiced against Luong based on the inflammatory pretrial publicity that saturated the community. In short, the trial court did not . get enough information to make a meaningful determination of juror impartiality.
Therefore, I dissent from the conclusion in the main opinion that “the Court of Criminal Appeals erred in holding that individual voir dire was mandated.” 199 So.3d at 157.
I also write to address the sentiment in the following paragraph from the main opinion:
“This Court has also considered Luong’s argument that the media coverage of Luong’s confession and the withdrawal of his guilty plea amounted to ‘the kind of deeply prejudicial pretrial exposure that jurors cannot be reasonably expected to ignore.’ However, in light of the admission into evidence at trial of Luong’s confession in which he admitted that he threw his children off the bridge, the publicity about his confession and guilty-plea proceeding did not result in a preconceived prejudice *172 that-permeated the trial, preventing the seating of a fair and impartial jury.”
199 So.3d at 148.
It appears that the main opinion concludes that because Luong was so obviously guilty it was harmless error, that his Sixth Amendment right to an impartial jury was violated. I disagree.
In Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the Supreme Court of the United States noted that a “‘fair trial in a fair tribunal is a basic requirement of due process.’ ” (Quoting In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955).) There, when the defendant was indicted for murder, the defendant immediately filed a motion for a change of venue alleging that the jury pool was highly prejudiced due to “widespread and inflammatory publicity.” 366 U.S. at 720. The trial court granted the defendant’s motion and transferred the case to Gibson County. Alleging that Gibson County was also saturated with inflammatory publicity, the defendant filed a second motion, for a change of venue. This motion was denied by the trial court based on the Indiana statute that allows only a single change of venue. However, based on an Indiana Supreme Court decision that states that it is a “ ‘duty of the judiciary to provide to every accused a public tidal by an impartial jury even though to do so, the court must grant a second change of venue and thus contravene [the statute],’ ” 366 U.S. at 721 (quoting State ex rel. Gannon v. Porter Circuit Court, 239 Ind. 637, 642, 159 N.E.2d 713, 715 (1959)), the United States Supreme Court agreed with the defendant that the media coverage in Gibson County was extensive and inflammatory and, thus, vacated the judgments of the Supreme Court of Indiana and the trial, court, which had denied the defendant’s second motion for a change of venue. The United States Supreme Court also added that only a jury, based on evidence presented in court, can strip a person of his or her liberty and that “this is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies.” 366 U.S. at 722.
In Coleman, the defendant had been charged with six counts of 'murder. The United States Court of Appeals for the Eleventh Circuit agreed with the State that evidence of the defendant’s guilt was overwhelming. 778 F.2d at 1541. However, regardless of the evidence of the defendant’s guilt in that case, the Coleman court affirmed the trial court’s holding that a presumption that the jury was prejudiced against the defendant based on extensive and inflammatory media coverage existed because “to hold otherwise would mean an obviously guilty defendant would have no right to a fair trial before an impartial jury, a holding which would be contrary to the well established and fundamental constitutional right of every defendant to a trial.” 778 F.2d at 1541.
In the case at hand, this Court should not simply overlook the presumption that the jury was prejudiced against Luong based on the overwhelming evidence of his guilt. To do so violates Luong’s right to a fair trial before an impartial jury.
Therefore, I must dissent.
MURDOCK and MAIN, JJ., concur.